# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# CIVIL DIVISION

UNITED STATES OF AMERICA
*ex rel.*
[UNDER SEAL]

Relator

Civil Action No.

**TO BE FILED IN CAMERA**
**AND UNDER SEAL**

vs.

DO NOT PUT IN PRESS BOX
DO NOT ENTER ON PACER

[UNDER SEAL]

Defendants.

**DOCUMENT TO BE KEPT UNDER SEAL**

**DO NOT ENTER ON PACER**

Jerry E. Martin
Seth Hyatt
Barrett, Johnston Martin & Garrison, LLC
414 Union Street; Suite 900
Nashville, TN 37219
(615) 244-2202

**Lead Counsel:**
Bryan A. Vroon
Georgia Bar No. 729086
Law Offices of Bryan A. Vroon, LLC
1766 West Paces Ferry Road
Atlanta Georgia 30327
(404) 441-9806

1

Edward D. Robertson, Jr.
Bartimus, Frickleton & Robertston
715 Swifts Highway
Jefferson City, MO. 65109
573-659-4454

# IN THE UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF TENNESSEE

### CIVIL DIVISION

UNITED STATES OF AMERICA
*ex rel.*
CAMILO RUIZ, D.O.

Relator

CASE NO.

**TO BE FILED IN
CAMERA AND UNDER SEAL**

vs.

DO NOT PUT IN PRESS BOX

DO NOT ENTER ON PACER


HOSPITAL CORPORATION OF AMERICA (HCA);
HCA HOLDINGS, INC. D/B/A HCA HEALTHCARE;
HCA, INC.; HCA HEALTHCARE CORPORATION;
HCA HEALTHCARE, INC.;
AVENTURA HOSPITAL AND MEDICAL CENTER;
BLAKE MEDICAL CENTER;
BRANDON REGIONAL HOSPITAL;
CENTRAL FLORIDA REGIONAL HOSPITAL;
CHIPPENHAM HOSPITAL;
CLEAR LAKE REGIONAL MEDICAL CENTER;
FAWCETT MEMORIAL HOSPITAL;
JFK MEDICAL CENTER;
KENDALL REGIONAL MEDICAL CENTER;
LARGO MEDICAL CENTER;
LAWNWOOD REGIONAL MEDICAL CENTER & HEART INSTITUTE;
LOS ROBLES HOSPITAL AND MEDICAL CENTER;
MEDICAL CENTER OF TRINITY;
MEDICAL CITY FORT WORTH;

MEDICAL CITY HOSPITAL;
MEMORIAL HOSPITAL;
METHODIST HOSPITAL;
METHODIST STONE OAK HOSPITAL;
MOUNTAINVIEW HOSPITAL;
NORTH FLORIDA REGIONAL MEDICAL CENTER;
NORTHSIDE HOSPITAL & TAMPA BAY HEART INSTITUTE;
NORTHWEST MEDICAL CENTER;
OAK HILL HOSPITAL;
OCALA REGIONAL MEDICAL CENTER;
ORANGE PARK MEDICAL CENTER;
OSCEOLA REGIONAL MEDICAL CENTER;
PALMS WEST HOSPITAL;
REDMOND REGIONAL MEDICAL CENTER;
REGIONAL MEDICAL CENTER BAYONET POINT;
REGIONAL MEDICAL CENTER OF SAN JOSE;
RIO GRANDE REGIONAL HOSPITAL;
RIVERSIDE COMMUNITY HOSPITAL;
SAINT LUCIE MEDICAL CENTER;
SAINT PETERSBURG GENERAL HOSPITAL;
SOUTHERN HILLS HOSPITAL & MEDICAL CENTER;
SUNRISE HOSPITAL & MEDICAL CENTER;
TRISTAR CENTENNIAL MEDICAL CENTER;
WESLEY MEDICAL CENTER;
WESTSIDE REGIONAL MEDICAL CENTER;
AND JOHN DOES 1-100
DEFENDANTS.


**<u>Relator's Complaint Under the Federal False Claims Act</u>**

Summary of the Action ................................................................................................. 8

Jurisdiction and Venue ............................................................................................. 15

Parties ...................................................................................................................... 16

The Medicare Program ............................................................................................. 19
    The Medicare Program's Requirements for Inpatient Status .................................. 22
    The 2-Midnight Policy and HCA's Exploitation of Vulnerabilities in CMS's
    Enforcement Capabilities ...................................................................................... 29

Defendants' Tactics to Increase Inpatient Admissions Without Regard to Medical
Necessity .................................................................................................................. 34
    Introduction to Dr. Ruiz's Work at Aventura Hospital .......................................... 34
    HCA Issued Regular Monitoring Reports to Hospitalists ...................................... 37
    The Monitoring Reports Functioned as Quotas for Hospitalists ........................... 41
    HCA Administrators Directed Hospitalists to Increase Inpatient Admissions and
    Decrease Observation Cases .................................................................................. 44
    HCA Has Implemented Intrusive Strategies to Monitor and Manage Patient
    Admissions and Discharges Based on Reimbursement Objectives ......................... 53

Aventura Hospital's Inpatient Admissions Have Escalated to Extraordinary Levels ...... 56
    Aventura's Inpatient Admissions Associated with Fever, Weakness, and Fatigue
    Increased to Nearly 600 Percent Above National and Florida Averages .................... 60
    Aventura's Inpatient Admissions Associated with Muscle Spasm, Low Back Pain,
    Lumbar Strain, and Cervical Strain Have Increased to Levels 400-500 Percent Over
    National Averages .................................................................................................. 62
    Aventura's Inpatient Admissions Associated with Cough, Dyspnea, and Asthma
    Increased by 747 Percent ....................................................................................... 64
    Aventura's Inpatient Admissions Based on Common Cardiovascular Codes Have
    Increased to Over Double National and Florida Averages ...................................... 66
    Aventura's Inpatient Admissions Associated with Common Neurology Codes Have
    Increased to 400 Percent Above National Averages ............................................... 68
    Aventura's Admission Rates Based on Common Gastroenterology Codes Increased to
    Approximately 300 Percent Above National Averages ........................................... 70
    Aventura's Overall Rates of Inpatient Admissions Escalated to Triple National
    Averages ................................................................................................................ 72

HCA East Florida Overall Inpatient Admissions Based on Seven Categories of
Diagnostic Codes Have Increased to Levels That Are at Least Double or Triple National
Averages .................................................................................................................. 73
    Kendall's Overall Rates of Inpatient Admissions Escalated to Triple the National
    Average ................................................................................................................. 73
    Palm West's Overall Rates of Inpatient Admissions Escalated to More Than Triple the
    National Average ................................................................................................... 74

St. Lucie's Overall Rates of Inpatient Admissions Exceeded Triple the National Average ...................................................................................... 75

Westside's Overall Rates of Inpatient Admissions Escalated to Triple the National Average ...................................................................................... 76

Northwest's Overall Rates of Inpatient Admissions Escalated to Triple the National Average .................................................................................. 77

JFK's Overall Rates of Inpatient Admissions Escalated to Nearly Triple the National Average ............................................................................... 79

Lawnwood's Overall Rates of Inpatient Admissions Escalated to Triple the National Average ................................................................................. 80

Plantation's Overall Rates of Inpatient Admissions Escalated to More Than Double the National Average ................................................................... 81

University's Overall Rates of Inpatient Admissions Escalated to Nearly Triple the National Average ............................................................................ 82

Raulerson's Overall Rates of Inpatient Admissions Escalated to Approximately Double the National Average ................................................................ 83

JFK North's Overall Rates of Inpatient Admissions Escalated to Over Double the National and Florida Averages ................................................... 85

HCA East Florida Hospitals Used Common Diagnoses of Fever, Weakness, and Fatigue to Move Patients into Inpatient Status ........................................ 86

Inpatient Admissions at JFK Associated with Fever, Weakness, and Fatigue Increased to Approximately 500 Percent Above National and Florida Averages .... 86

Inpatient Admissions at St. Lucie Associated with Fever, Weakness, and Fatigue Increased to Approximately 500 Percent Above National and Florida Averages .... 88

Inpatient Admissions at Lawnwood Associated with Fever, Weakness, and Fatigue Increased to Approximately 500 Percent Above National and Florida Averages .... 90

Inpatient Admissions at Northwest Associated with Fever, Weakness, and Fatigue Increased to Approximately 500 Percent Above National and Florida Averages .... 92

Inpatient Admissions at Palms West Associated with Fever, Weakness, and Fatigue Increased to Nearly 600 Percent Above National and Florida Averages ................ 94

Inpatient Admissions at Kendall Associated with Fever, Weakness, and Fatigue Increased to Nearly 300 Percent Above National Averages..................................... 95

Inpatient Admissions at Plantation Associated with Fever, Weakness, and Fatigue Increased to Approximately 250 Percent Above National Averages ....................... 98

HCA East Florida Hospitals Used Common Diagnoses of Muscle Spasm, Low Back Pain, Lumbar Strain, and Cervical Strain to Push Patients into Inpatient Status.......... 99

Palm West's Rates of Inpatient Admissions Associated with Muscle Spasm, Low Back Pain, Lumbar Strain, and Cervical Strain Have Increased to Levels 640 Percent Over the National Average ................................................... 99

JFK's Rates of Inpatient Admissions Associated with Muscle Spasm, Low Back Pain, Lumbar Strain, and Cervical Strain Have Increased to Levels 300-400 Percent Over National Averages.............................................................. 101

St. Lucie's Rates of Inpatient Admissions Associated with Muscle Spasm, Low Back Pain, Lumbar Strain, and Cervical Strain Have Increased to Levels 300-400 Percent Over National Averages........................................................... 103

HCA East Florida Hospitals Used Common Conditions of Cough, Dyspnea, and Asthma to Move Patients into Inpatient Status ........................................................ 105

Kendall's Rates of Inpatient Admissions Associated with Cough, Dyspnea, and Asthma Increased by 850 Percent .......................................................................... 107

Northwest's Rates of Inpatient Admissions Associated with Cough, Dyspnea, and Asthma Increased by 640 Percent .......................................................................... 108

HCA's Scheme Extends Beyond These Seven Categories of Diagnosis Codes ............ 109

Aventura's Inpatient Admissions Associated with Cardiovascular Codes of Hypertension, Edema, and Hypotension Were Nearly Triple the National Average . 112

Aventura's and HCA East Florida's Inpatient Admissions Associated with Endocrinology Codes Were Approximately Triple the National Average ................ 113

Aventura's and HCA East Florida's Inpatient Admissions Associated with Hematology Codes Were Over Double the National Average ........................................................ 114

Aventura's and HCA East Florida's Inpatient Admissions Associated with Neurology Codes Were Nearly Double the National Average .................................................... 116

Aventura's and HCA East Florida's Inpatient Admissions Associated with Gastroenterology Codes Were Nearly Double the National Average ....................... 117

Aventura's and HCA East Florida's Inpatient Admissions Associated with Pulmonary Codes Were Over Double the National Average ........................................................ 118

Aventura's and HCA East Florida's Inpatient Admissions Associated with Urology Codes Were Over Double the National Average ........................................................ 119

Escalating Inpatient Admissions at HCA East Florida Hospitals Have Caused Massive Damages to the Medicare Program .................................................................................... 120

HCA's Inpatient Scheme is National Problem That Has Cost The Medicare Program In Excess of $5 Billion in the Last Five Years .................................................................... 121

The Leading 27 HCA Hospitals With Extraordinary 7-Year Inpatient Admission Rates More than Double National Averages ....................................................................... 123

27 HCA Hospitals Each With Damages to the Medicare Program in Excess of $12 Million Per Year ...................................................................................................... 126

Defendants' Knowledge of Their Submission of False Claims and False Certifications 128

Relator's Extensive Analyses of Diagnoses Codes Submitted by Hospitals to Medicare Do Not Constitute a Public Disclosure .......................................................................... 133

Over Two Billion Numeric Codes in a Vast Database Did Not Alert the Government to the False Claims at Issue ......................................................................................... 136

Count I---Presenting False Claims in Violation of 31 U.S.C. § 3729(a) (1)(A) ............. 139

Count II---False Claims Act: Making or Using False Records or Statements, 31 § U.S.C. 3729(a)(1)(B) ................................................................................................................. 141

Count III-Conspiring to Submit False Claims in Violation of 31 U.S.C. § 3729(a)(1)(C) Against All Defendants ................................................................................................. 143

Count IV---Submission of Express and Implied False Certifications in Violation of 31 U.S.C. § 3729(a)(1)(B) Against All Defendants ........................................................... 144

Count V---Knowingly Causing and Retaining Overpayments in Violation of 31 U.S.C. § 3729(a)(1)(G) Against All Defendants .......................................................................... 145

Count VI--- False Record to Avoid an Obligation to Refund Against All Defendants .. 146

Prayers for Relief ............................................................................................................ 147

## **Summary of the Action**

1.      This is an action for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729–3732.

2.      Defendants Hospital Corporation of America, HCA Holdings, Inc. d/b/a HCA Healthcare, HCA, Inc., HCA Healthcare Corporation, and HCA Healthcare, Inc. (collectively referred to as "HCA") own and operate a national for-profit hospital system based in Nashville, Tennessee. HCA currently owns and operates approximately 172 hospitals in the United States and United Kingdom.

3.      Over the course of the last five years, HCA has engaged in a systematic practice of maximizing revenues by inducing hospitalists and other physicians at HCA hospitals to increase inpatient admissions without regard to whether such admissions were medically necessary.

4.     HCA has targeted hospitalists because hospitalists or primary care physicians are usually responsible for ultimately deciding whether a patient should be admitted to a hospital. *See* Medicare Benefit Policy Manual 100-02, Ch. 1, Sec. 10. The model for determining inpatient admissions at HCA hospitals revolves around the decision-making of hospitalists or primary care physicians.

5.     Hospitals receive different rates of reimbursement for different levels of care (e.g., inpatient vs. outpatient care). Outpatient care includes treating a patient in the emergency room and sending her home as well as outpatient observation, in which a patient is treated, assessed, and observed for up to 48 hours to determine whether her condition has improved enough to be discharged or instead requires admission to the hospital as an inpatient. *See* Medicare Benefit Policy Manual 100-2, Ch. 6, Sec. 20.6.

6.     When a hospital admits a beneficiary as an inpatient who should have received the same treatment at a lower level of care, Medicare pays a reimbursement amount that is a multiple of the reimbursement amount the hospital would have received had it billed for the services as an outpatient. Hospitals can significantly increase their Medicare reimbursement revenues by admitting a

patient who should not have been admitted, but only observed or released. For example, with respect to the diagnosis codes discussed below, over the last seven years, the transfer of these patients to inpatient status resulted in increased payments to HCA hospitals of approximately $9,280.00 on average for each admission.

7.    In the last five years, HCA's tactics have led to an enormous escalation in inpatient admissions of Medicare patients based on common diagnoses usually treated on an outpatient basis. As discussed in detail below, this escalation in inpatient admissions has occurred at many HCA hospitals within the HCA East Florida Division and throughout the United States.

8.    This case is about corporate financial interests subverting medical decision-making through a nationwide scheme by HCA to increase inpatient admissions for reimbursement objectives, not medical need.

9.    In addition to causing Medicare to pay for unnecessary inpatient stays, these admissions exposed Medicare beneficiaries to the dangers inherent in any hospital stay, including but not limited to medical errors and hospital-acquired infections.

10. Observation services are appropriate when a Medicare beneficiary presents to the emergency room ("ER") with symptoms whose treatment or monitoring requires more time to assess than the typical ER visit. Observation is used to help the physician decide whether the patient needs to be admitted or can be discharged.

11. Medicare reimburses for observation services as outpatient services, even if the patient stays in the hospital overnight. As with inpatient admissions, observation services must be reasonable and necessary for treatment of the patient's medical condition in order to be reimbursed by Medicare.

12. For revenue reasons, HCA has implemented aggressive strategies to require hospitalists and other primary care physicians to admit patients as inpatients rather than observe, monitor, and discharge the patients as outpatients.

13. More than 50 million people are enrolled in Medicare. There are approximately 4,700 inpatient hospital facilities enrolled as Medicare providers. In 2012, Medicare paid hospitals approximately $119 billion for inpatient services and $46 billion for

outpatient services. *See* MedPAC Report to the Congress: Medicare

Payment Policy, March 2015, p. 53, Table.

14.     The magnitude of the Medicare Program requires Medicare to

trust hospitals and doctors to prioritize the needs of beneficiaries,

rather than their own financial self-interests, in making admission

decisions.

15.     HCA's executive management developed and implemented

practices and procedures that violate that trust and instead induced

doctors to admit Medicare patients as inpatients despite common

diagnosis codes usually treated on an outpatient basis.

16.     These policies and practices were adopted for HCA's financial

gain rather than clinical reasons and included: 1) directing

hospitalists to move more patients into inpatient status instead of

observation status; 2) sending regular monitoring reports to

physicians with detailed data about their inpatient admissions and

observation cases compared to other physicians within the

respective HCA Division; 3) creating and fostering competition

among hospitalists to reduce observation cases and increase

inpatient admissions; 4) reprimanding and threatening termination

of hospitalists whose observation case data fell more than 1.0

standard deviation higher than other hospitalists within the respective HCA Division; 5) employing case managers and administrators to pressure hospitalists to move patients into inpatient status and then quickly discharge them; 6) directing, monitoring, and pressuring hospitalists to increase referrals of inpatients to HCA's employed specialists; 7) orchestrating a massive escalation in inpatient admissions of Medicare patients based on common diagnoses usually treated on an outpatient basis; and 8) criticizing and removing hospitalists who did not fall in line with the HCA "strategic agenda" for increased inpatient reimbursements.

17.     With respect to these policies and practices, HCA implemented extensive centralized monitoring and enforcement systems to achieve its revenue-driven objectives for inpatient admissions. HCA's national executive management team maintains tight corporate control over the operations of its hospitals through a hierarchy of subordinate executives within HCA's geographic divisions and individual hospitals. HCA hospitals are organized under geographic divisions with HCA executives in positions of management for each division. The hospital executives report to the

division executives and the division executives all report to HCA's national executives located at HCA headquarters in Nashville, Tennessee.

18.     HCA's scheme has sought: (1) higher reimbursements from inpatient admissions as compared to observation or outpatient treatment, and (2) increased referrals of inpatients to HCA-employed specialists for consultations and follow-up care. As discussed below, HCA's scheme has succeeded at enormous expense to the Medicare Program.

19.     As a result of HCA's tactics and the consequent escalation in Medicare inpatient admissions in the last five years, HCA's hospital system has claimed and received over $5 billion in overpayments from the Medicare Program to which they were not entitled.

20.     In making these payments, the Medicare Program was unaware of HCA's scheme and could not have known that HCA was presenting false claims to Federal Healthcare Programs. HCA's scheme and the scope of HCA's scheme were virtually undetectable without the knowledge of HCA' internal tactics and the application of that knowledge in a comprehensive analyses of HCA's claims to the Medicare Program over the last five years.

21.     In this Complaint, Relator Dr. Ruiz provides an overview of the Medicare reimbursement process and then describes HCA's internal tactics to increase inpatient admissions for revenue reasons throughout the HCA East Florida Division composed of 14 hospitals. The Complaint then discusses the dramatic escalation in Medicare inpatient admissions at Aventura Hospital associated with diagnosis codes usually treated on an outpatient basis. Next, the Complaint analyzes the impact of HCA's schemes at other hospitals within the HCA East Florida Division, including analyses of inpatient admissions associated with specific diagnoses codes usually treated on an outpatient basis. The Complaint then analyzes inpatient admission rates at HCA East Florida hospitals associated with other diagnosis codes compared to national norms.    The Complaint further identifies and discusses 39 HCA hospitals nationally with extraordinary inpatient admission rates causing massive damages to the Medicare Program each year.

## Jurisdiction and Venue

22.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1345 because the United States is the

Plaintiff. In addition, the Court has subject matter jurisdiction over the FCA cause of action under 28 U.S.C. § 1331.

23.     This Court has personal jurisdiction over HCA pursuant to 31 U.S.C. § 3732(a) because HCA has its national headquarters in Nashville, Tennessee.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because at least one of the Defendants can be found in, resides in and transacts business in the Middle District of Tennessee.

**Parties**

25.     The qui tam plaintiff ("Relator") is Camilo Ruiz, D.O., a hospitalist physician who has worked at Defendant Aventura Hospital and Medical Center in Aventura, Florida between 2011 and the present.

26.     Dr. Ruiz brings this action on behalf of the United States of America, including the United States Department of Health & Human Services ("HHS") and, specifically, its operating division, the Centers for Medicare & Medicaid Services ("CMS"). At all times relevant to this Complaint, CMS was an operating division of HHS that administered and supervised the Medicare Program.

27.     Defendants Hospital Corporation of America, HCA Holdings, Inc. d/b/a HCA Healthcare, HCA, Inc., HCA Healthcare Corporation, and HCA Healthcare, Inc. (collectively referred to as "HCA") own and operate a national for-profit hospital system based in Nashville, Tennessee. HCA currently owns and operates approximately 172 hospitals in the United States and United Kingdom.

28.     The individual HCA hospitals listed as Defendants are as follows with their principal place of business and provider identification numbers:

| Prov ID | Facility Name | Street Address | City | State | Zipcode |
|---------|---------------|----------------|------|-------|---------|
| 100131 | Aventura Hospital and Medical Center | 20900 Biscayne Boulevard | Aventura | FL | 33180 |
| 100213 | Blake Medical Center | 2020 59th Street West | Bradenton | FL | 34209 |
| 100243 | Brandon Regional Hospital | 119 Oakfield Drive | Brandon | FL | 33511 |
| 100161 | Central Florida Regional Hospital | 1401 West Seminole Boulevard | Sanford | FL | 32771 |
| 490112 | Chippenham Hospital | 7101 Jahnke Road | Richmond | VA | 23225 |
| 450617 | Clear Lake Regional Medical Center | 500 Medical Center Boulevard | Webster | TX | 77598 |
| 100236 | Fawcett Memorial Hospital | 21298 Olean Boulevard | Port Charlotte | FL | 33952 |
| 100080 | JFK Medical Center | 5301 South Congress Avenue | Atlantis | FL | 33462 |
| 100209 | Kendall Regional Medical Center | 11750 Southwest 40th Street | Miami | FL | 33175 |
| 100248 | Largo Medical Center | 201014th Street Southwest | Largo | FL | 33770 |
| 100246 | Lawnwood Regional Medical Center & Heart Institute | 1700 South 23rd Street | Fort Pierce | FL | 34950 |

| 050549 | Los Robles Hospital and Medical Center | 215 West Janss Road | Thousand Oaks | CA | 91360 |
|---|---|---|---|---|---|
| 100191 | Medical Center of Trinity | 9330 State Road 54 | Trinity | FL | 34655 |
| 450672 | Medical City Fort Worth | 900 Eighth Avenue | Fort Worth | TX | 76104 |
| 450647 | Medical City Hospital | 7777 Forest Lane | Dallas | TX | 75230 |
| 100179 | Memorial Hospital | 3625 University Boulevard | Jacksonville | FL | 32216 |
| 450388 | Methodist Hospital | 7700 Floyd Curl Drive | San Antonio | TX | 78229 |
| 670055 | Methodist Stone Oak Hospital | 1139 East Sonterra Boulevard | San Antonio | TX | 78258 |
| 290039 | MountainView Hospital | 3100 North Tenaya Way | Las Vegas | NV | 89128 |
| 100204 | North Florida Regional Medical Center | 6500 Newberry Road | Gainesville | FL | 32605 |
| 100238 | Northside Hospital & Tampa Bay Heart Institute | 6000 49th Street North | Saint Petersburg | FL | 33709 |
| 100189 | Northwest Medical Center | 2801 North State Road 7 | Margate | FL | 33063 |
| 100264 | Oak Hill Hospital | 11375 Cortez Boulevard | Brooksville | FL | 34613 |
| 100212 | Ocala Regional Medical Center | 1431 Southwest First Avenue | Ocala | FL | 34471 |
| 100226 | Orange Park Medical Center | 2001 Kingsley Avenue | Orange Park | FL | 32073 |
| 100110 | Osceola Regional Medical Center | 700 West Oak Street | Kissimmee | FL | 34741 |
| 100269 | Palms West Hospital | 13001 Southern Boulevard | Loxahatchee | FL | 33470 |
| 110168 | Redmond Regional Medical Center | 501 Redmond Road | Rome | GA | 30165 |
| 100256 | Regional Medical Center Bayonet Point | 14000 Fivay Road | Hudson | FL | 34667 |
| 050125 | Regional Medical Center of San Jose | 225 North Jackson Avenue | San Jose | CA | 95116 |
| 450711 | Rio Grande Regional Hospital | 101 East Ridge Road | McAllen | TX | 78503 |
| 050022 | Riverside Community Hospital | 4445 Magnolia Avenue | Riverside | CA | 92501 |
| 100260 | Saint Lucie Medical Center | 1800 Southeast Tiffany Avenue | Port Saint Lucie | FL | 34952 |
| 100180 | Saint Petersburg General Hospital | 6500 38th Avenue North | Saint Petersburg | FL | 33710 |
| 290047 | Southern Hills Hospital & Medical Center | 9300 West Sunset Road | Las Vegas | NV | 89148 |
| 290003 | Sunrise Hospital & Medical Center | 3186 South Maryland Parkway | Las Vegas | NV | 89109 |
| 440161 | TriStar Centennial Medical Center | 2300 Patterson Street | Nashville | TN | 37203 |

| 170123 | Wesley Medical Center | 550 North Hillside | Wichita | KS | 67214 |
| 100228 | Westside Regional Medical Center | 8201 West Broward Boulevard | Plantation | FL | 33324 |

## The Medicare Program

29.     Enacted in 1965, Title XVIII of the Social Security Act, 42 U.S.C. § 1395, et seq., establishes the Health Insurance for the Aged and Disabled Program, commonly known as the Medicare Program or, simply Medicare.

30.     The Medicare Program is comprised of four parts: Part A which provides Hospital Insurance Benefits, Part B which provides Medical Insurance Benefits, Part C which establishes Medicare Advantage (or managed care) plans, and Part D which provides for Prescription Drug Benefits. Relevant to this complaint are Parts A and B.

31.     Medicare Part A is a 100 percent federally-funded health insurance program for qualified individuals aged 65 and older, younger people with qualifying disabilities, and people with End Stage Renal Disease (permanent kidney failure requiring dialysis or transplant). *See* 42 U.S.C. §§ 426, 426A.

32.     The majority of Medicare Part A's costs are paid by United States citizens through their payroll taxes. The benefits covered by Medicare Part A include inpatient hospital care and other institutional care, including skilled nursing facility and home health care services. *See* 42 U.S.C. §§ 1395c –1395i-5.

33.     Medicare Part B establishes a voluntary supplemental insurance program that pays for various medical and other health services and supplies, including physician services, physical, occupational, and speech therapy services and hospital outpatient services. See 42 U.S.C. §§ 1395k, 1395m, 1395x.

34.     Most hospitals, including HCA's national hospital system, derive a substantial portion of their revenue from the Medicare Program.

35.     Medicare is administered by the Centers for Medicare & Medicaid Services (CMS). At all times relevant to this Complaint, CMS contracted with private contractors referred to as "fiscal intermediaries," "carriers," and "Medicare Administrative Contractors," to act as agents in reviewing and paying claims submitted by healthcare providers. Payments are made with federal funds. *See* 42 U.S.C. § 1395h; 42 C.F.R. §§ 421.3, 421.100.

36.    To participate in the Medicare Program, health care providers

enter into provider agreements with the Secretary of HHS. 42

U.S.C. § 1395cc. The provider agreement requires the provider to

agree to conform to all applicable statutory and regulatory

requirements for reimbursement from Medicare, including the

provisions of Section 1862 of the Social Security Act and Title 42

of the Code of Federal Regulations.

37.    As part of that agreement, the provider must sign the following

certification:

> I agree to abide by the Medicare laws, regulations and program
> instructions that apply to [me]. The Medicare laws, regulations,
> and program instructions are available through the [Medicare]
> contractor. I understand that payment of a claim by Medicare is
> conditioned upon the claim and the underlying transaction
> complying with such laws, regulations, and program instructions
> (including, but not limited to, the Federal anti-kickback statute and
> the Stark law), and on the [provider's] compliance with all
> applicable conditions of participation in Medicare.

Form CMS-855A; Form CMS-8551.

38.    Among the legal obligations of participating providers is the

requirement not to make false statements or misrepresentations of

material facts concerning payment requests. *See* 42 U.S.C. § 1320a-

7b(a)(1)-(2); 42 C.F.R. §§ 1320a-7b(a)(1)-(2), 413.24(f)(4)(iv).

## The Medicare Program's Requirements for Inpatient Status

39.     Medicare reimburses only services that are "reasonable and necessary for the diagnosis or treatment of illness or injury . . . ." *See* 42 U.S.C. § 1395y(a)(1)(A). In submitting claims for payment to Medicare, providers must certify that the information on the claim form presents an accurate description of the services rendered and that the services were reasonably and medically necessary for the patient.

40.     Federal law provides that it is the obligation of the provider of health care services to ensure that services provided to Medicare beneficiaries are "provided economically and only when, and to the extent, medically necessary[,]" and are "[s]upported by evidence of medical necessity." 42 U.S.C. § 1320c-5(a)(1), (3).

41.     "[T]he medical record must indicate that inpatient hospital care was medically necessary, reasonable, and appropriate for the diagnosis and condition of the beneficiary." Medicare Program Integrity Manual, Ch. 6, Section 6.5.2.

42.     Medicare defines an inpatient as a person who has been formally admitted to a hospital by a physician for the purpose of

receiving inpatient services. *See* CMS Publication 100-02, Medicare Benefit Policy Manual, Ch. 1, § 10 (Rev. 189).

43.     The decision to admit a beneficiary as an inpatient is made by the treating physician, who must consider several clinical factors including the beneficiary's medical history, the severity of the beneficiary's symptoms, and the expected care. *See* CMS, *Medicare Benefit Policy Manual* (MBPM), Pub. No. 100-02, Ch. 1, § 10.

44.     The Medicare Program Integrity Manual states that "inpatient care rather than outpatient care is required only if the beneficiary's medical condition, safety, or health would be significantly and directly threatened if care was provided in a less intensive setting." *See* Medicare Program Integrity Manual, Ch. 6, Section 6.5.2.

45.     Medicare requires that hospitals implement a utilization review plan to ensure that all inpatient admissions are medically necessary. See 42 C.F.R. § 482.30

46.     The Inpatient Prospective Payment System ("IPPS") reimburses hospitals for acute care inpatient services. This is a system developed for Medicare to classify inpatient hospital cases into one of 538 Diagnostic Related Groups ("DRGs"), which were expected to have similar hospital resource use.

47. Since 1983 DRGs have been used to determine how much Medicare pays the hospital. Patients within each category are similar clinically and are expected to consume a similar level of hospital resources. A payment rate is established for each DRG.

48. Each stay is classified into a Medicare severity diagnosis related group (MS-DRG). These groups are based on the beneficiary's primary and secondary diagnoses and the procedures the hospital performed, as well as other factors. Each MS-DRG generally falls into one of three severity levels, depending on the beneficiary's secondary diagnoses. For example, a beneficiary with no secondary diagnoses that increase the complexity of care would be in a low-severity MS-DRG, a beneficiary with asthma would be in a medium-severity MS-DRG, and a beneficiary with pneumonia would be in a high-severity MS-DRG. Medicare pays hospitals a different payment rate for each MS-DRG.[1] Payment rates are adjusted by a variety of facility-level factors, such as a geographic factor to account for differences in labor costs.

49. Hospital outpatient services, including care rendered in a hospital ED or when a beneficiary receives "observation" services,

_____

[1] DRGs and MS-DRGs will be collectively referred to as DRGs for clarity.

are reimbursed under the hospital Outpatient Prospective Payment System (OPPS) by Medicare Part B. All outpatient services are classified into groups called Ambulatory Payment Classifications (APCs).

50.     When a hospital bills Medicare for outpatient visits, the claim typically includes many services. Under the OPPS, each service has an associated Medicare payment rate. For most services, Medicare pays 80 percent of this rate, while the beneficiary is responsible for the remaining 20 percent. *See* Social Security Act, § 1833(t); 42 CFR § 419.40(b); CMS, *Medicare Claims Processing Manual*, Pub. No. 100-04, ch. 4, § 30.

51.     Services in each APC are similar in clinical conditions and resources required for treatment. A payment rate is established for each APC. Depending on the services provided, hospitals may be paid for more than one APC per patient encounter.

52.     Medicare classifies observation services as a type of hospital outpatient care. Observation services help the physician determine the cause of a patient's symptoms to decide if the patient needs to be admitted as an inpatient or may be discharged.

53.     Typically observation services are ordered for patients who present to the emergency department and who require a significant period of treatment or monitoring to inform a decision by physicians concerning their admission or discharge. Observation services include short-term treatment, assessment, and reassessment provided while a decision is being made about discharge or admission.

54.     A patient may receive observation services in an emergency department, a dedicated observation unit, or in any bed in the hospital. A patient receiving observation services receives all nursing, medical care, diagnostic tests (e.g., laboratory tests, x-rays and other radiological tests), therapy, and prescriptions ordered by her physician, as well as a bed and food for the duration of her stay.

55.     Medicare expects that a decision whether to discharge a patient receiving observation services or admit her as an inpatient will occur in less than 48 hours, and usually in less than 24 hours. *See* CMS Publication 100-02, Medicare Benefit Policy Manual, Ch. 6, § 20.6 (Rev. 189).

56.    At all times relevant to this Complaint, observation services were billed as a time-based service, with the minimum period of observation that was reimbursable being eight hours.

57.    Since 2008, hospitals may bill a composite APC for extended assessment and management of any patient who receives observation services for eight or more hours who had an ED visit the day that observation services began or the previous day. *See* CMS Publication 100-04, Medicare Claims Processing Manual, Ch. 4 § 290.5.1 (Rev. 787).

58.    Medicare reimburses hospitals for surgical procedures on either an inpatient or an outpatient basis, depending on whether the patient has been formally admitted as an inpatient (and subject to medical necessity review). Medicare designates certain procedures as payable only when performed on an inpatient basis. Medicare's rationale for designating certain procedures as "inpatient only" is that either the nature of the procedure, the typical underlying physical condition of patients who require the procedure, or the need for at least 24 hours of postoperative recovery time or monitoring before the patient can be safely discharged dictates that Medicare payment is appropriate only if the service is furnished on

an inpatient basis. *See* CMS Publication 100-04, Medicare Claims Processing Manual, Ch. 4 §180.7 (Rev. 787).

59.     These procedures are called "inpatient only" procedures. CMS publishes a list of "inpatient only" procedures annually. All other Medicare-covered procedures may be provided---and paid by Medicare---on either an inpatient or an outpatient basis, depending upon the individual patient's clinical condition and reaction to the surgery, including any complications that occur. An individualized assessment of the patient's condition must be made instead of routinely admitting all patients who have a certain procedure not listed on the inpatient only list.

60.     Medicare guidance directs hospitals to not bill for routine observation following all outpatient surgery, as a period of postoperative monitoring during a standard recovery period (e.g., 4-6 hours) is included in Medicare reimbursement for outpatient surgery. *See* CMS Publication 100-04, Medicare Claims Processing Manual, Ch. 4 §290.2.2 (Rev. 787).

61.     The Medicare Program Integrity Manual instructs FIs and MACs that in order for a claim for inpatient care to be payable: Review of the medical record must indicate that inpatient hospital

care was medically necessary, reasonable, and appropriate for the diagnosis and condition of the beneficiary at any time during the stay. The beneficiary must demonstrate signs and/or symptoms severe enough to warrant the need for medical care and must receive services of such intensity that they can be furnished safely and effectively only on an inpatient basis. *See* CMS Publication 100-08, Medicare Program Integrity Manual, Ch. 6 § 6.5.2 (Rev. 656).

62.    Following the discharge of a Medicare beneficiary from a hospital, the hospital submits a patient-specific claim for interim reimbursement for items and services furnished to the beneficiary during his or her hospital stay. 42 C.F.R. §§413.1, 413.60, 413.64. Hospitals submit claims on Form CMS-1450, also called Form UB-04. Claims for inpatient services are submitted to Medicare Part A. Claims for observation and other outpatient services, including ED visits and outpatient surgery, are submitted to Medicare Part B.

**The 2-Midnight Policy and HCA's Exploitation of Vulnerabilities in CMS's Enforcement Capabilities**

63.    Until Fiscal Year 2014, Medicare guidance advised physicians to "use a 24-hour period as a benchmark, i.e., they should order

admission for patients who are expected to need hospital care for 24 hours or more, and treat other patients on an outpatient basis." *See* CMS Publication 100-02, Medicare Benefit Policy Manual, Ch. 1, § 10 (Rev. 189).

64.    In fiscal year (FY) 2014, CMS implemented "the 2-midnight policy" to further address the appropriateness of inpatient hospital admissions. *See* 78 Fed. Reg. 50506 (Aug. 19, 2013). The policy established that inpatient payment is generally appropriate if physicians expect beneficiaries' care to last at least 2 midnights; otherwise, outpatient payment would generally be appropriate.

65.    CMS implemented the 2-midnight policy to address vulnerabilities in hospitals' billing of short inpatient stays and long outpatient stays and the associated cost to Medicare and beneficiaries. Before the policy was implemented, CMS found that a significant portion of payments for short inpatient stays—i.e., stays lasting less than 2 midnights—were improper because the services should have been billed as outpatient services. CMS, Comprehensive Error Rate Testing, *Medicare Fee-for-Service 2014 Improper Payment Report*, July 2015.

66. Before the 2-midnight policy was implemented, OIG found that Medicare paid hospitals more for short inpatient stays than for outpatient stays, on average, and that some hospitals were far more likely to use short inpatient stays rather than outpatient stays. OIG, *Hospitals' Use of Observation Stays and Short Inpatient Stays for Medicare Beneficiaries*, OEI-02-12-00040, July 2013. OIG "concluded that hospitals have a financial incentive to use short inpatient stays." *See* OIG, "Vulnerabilities Remain Under Medicare 2-Midnight Hospital Policy" (OEI-02-15-00020) (December 19, 2016).

67. The 2-Midnight Policy established that inpatient stays lasting at least 2 midnights from the date of inpatient admission will be presumed appropriate for payment. Those lasting less than 2 midnights may be reviewed by CMS for compliance with the policy. CMS identified several circumstances under which a stay—though short—would nevertheless be appropriate and consistent with the policy.

68. These circumstances include stays with: inpatient-only procedures; mechanical ventilation initiated during the visit; an unforeseen circumstance, such as the beneficiary's death, transfer to

another hospital, or leaving against medical advice; or 2 midnights or longer in the hospital when outpatient time prior to admission is added to inpatient time. See 80 Fed. Reg. 70540–70541 (July 8, 2015) and CMS, *Frequently Asked Questions: 2 Midnight Inpatient Admission Guidance & Patient Status Reviews for Admissions on or after October 1, 2013*.

69.     Since the 2-Midnight policy was implemented, CMS has engaged in limited reviews of short inpatient stays. CMS's Medicare Administrative Contractors reviewed medical records for small samples of short inpatient stays. If the results of the sample indicated poor compliance with the policy, the contractors educated the hospital and conducted further reviews.

70.     On December 19, 2016, the U.S. Department of Health and Human Services, Office of Inspector General (HHS-OIG) issued a report, "Vulnerabilities Remain Under Medicare 2-Midnight Hospital Policy" (OEI-02-15-00020).

71.     The report's findings were based on an examination of paid Medicare Part A and Part B hospital claims (without undertaking a review of the underlying medical records) from federal fiscal years 2013 and 2014. For purposes of the report, HHS-OIG defined a

"short stay" as one that lasted less than two midnights. A "long stay" was defined as a stay of two midnights or more.

72.     The 2016 OIG report "found that the number of inpatient stays decreased and the number of outpatient stays increased since the implementation of the 2-midnight policy." "Despite these changes, vulnerabilities still exist." *Id.*

73.     "Hospitals are billing for many short inpatient stays that are potentially inappropriate under the 2-midnight policy, and some of these stays are for similar reasons as short outpatient stays. This raises concerns that Medicare is paying differently for similar care and may reflect hospitals' financial incentives to use inpatient stays." *Id.*

*74.*     "CMS needs to address these vulnerabilities by improving oversight of hospital billing under the 2-midnight policy and increasing protections for beneficiaries." *Id.*

75.     OIG and CMS have been generally aware of the potential for fraud and abuse with hospitals moving patients into inpatient status for reasons of higher reimbursement, but OIG and CMS were not aware of HCA's illegal scheme revealed in this case. HCA's scheme and the scope of that scheme were virtually undetectable

without the insider knowledge and investigation conducted by Dr. Ruiz and presented in this action.

## **Defendants' Tactics to Increase Inpatient Admissions Without Regard to Medical Necessity**

### **Introduction to Dr. Ruiz's Work at Aventura Hospital**

76.     Dr. Ruiz originally interviewed for an employed hospitalist position with Aventura Hospital and Medical Center on June 7th, 2011. His interview was with Dr. Andres Soto and with the former Aventura Chief Executive Officer, Heather Rohan, who has since been promoted to HCA's TriStar Division. During this interview Soto and Rohan stated that they were developing the hospitalist model within their facility to "support" or generate referrals to their employed physician specialists.

77.     Dr. Ruiz's employment contract was finalized in October of 2011. In January of 2012 Dr. Ruiz learned that Aventura planned to switch all of its employed hospitalists to EmCare.

78.     On January 3, 2012 all hospitalists including the Medical Director, Andres Soto, received a 90-day termination notice. Mary Germann, Director of HCA Physician Services, delivered the

termination notice at a face-to-face meeting with the hospitalists. She stated that HCA and EmCare were embarking on a "hybrid" venture for their hospitalist model.

79.     Two representatives from EmCare, Clayton Swalstad and Steve Bartow, also attended this meeting and spoke with the hospitalists. Bartow's explanation for the change was that the hospitalists would now be paid on a "eat what you kill model."

80.     As Dr. Ruiz made the transition to EmCare, he witnessed HCA administrators' focus on the hospitalists' referral patterns to HCA employed specialists. Dr. Ruiz also became aware of Aventura administrators pressuring and inducing the hospitalists to order "soft" inpatient admissions without legitimate medical necessity. Inpatient admissions led to higher reimbursements for the hospital system and more referrals to HCA employed specialists.

81.     Dr. Andres Soto attempted to guide the hospitalist group during the EmCare transition but he did not carry out the HCA/EmCare mandates that he was given and he was terminated on August 24, 2012. The interim director was Dr. Mylissa Graber, an emergency room physician employed by EmCare.

82.     In November of 2012, Dr. Hamid Feiz was hired to manage the EmCare hospitalist group and develop graduate medical education programs within Aventura Hospital. Under his management, EmCare terminated physicians who did not comply with the referral patterns demanded by Aventura administrators.

83.     In June of 2013, Dr. Ruiz was terminated without cause (despite his contract stating that just cause was required). Dr. Ruiz was terminated because Aventura administrators required higher numbers of referrals to HCA-employed specialists.

84.     Dr. Ruiz left Aventura Hospital in August of 2013 to work at another facility. He returned to work at Aventura Hospital in October of 2014 after being offered an independent contractor agreement by Preferred Care Partners and Medica Health. At that time, Dr. Ruiz contacted a former colleague from his HCA/EmCare days, Dr. Darilo Chirino, who had since left and gone to work at another hospital system. Dr. Ruiz and Dr. Chirino both signed direct hospitalist contracts with Preferred Care Partners. Since October of 2014, Dr. Ruiz has worked as a hospitalist at Aventura under his independent contractor agreement with Preferred Care Partners.

**HCA Issued Regular Monitoring Reports to Hospitalists**

85.     Throughout the time periods that Dr. Ruiz worked at Aventura since 2011, Dr. Ruiz received monthly "report cards" or monitoring reports from Aventura's administration.

86.     These monitoring reports were routinely circulated to hospitalists, executives and staff at Aventura, and HCA executives managing the HCA East Florida Division.

87.     The monitoring reports tracked each physician's percentages of inpatient admissions to the hospital, average length of stay for inpatient cases, above average costs for inpatient cases, average total costs for inpatient cases, variable costs, above average direct costs for inpatient cases, top ten consulting physicians used with the numbers of referrals to each consulting physician, procedure counts, case mix index, clinical severity level, DRG, observation case count, average observation charges, observation length of stay, observation cases over 24 hours, observation above average charges, and observation primary diagnoses.

88.     These multiple categories tracked by HCA administrators generally concerned hospital reimbursement, not quality of patient care.

89.     The monitoring reports tracked numerous data points for each physician on a monthly basis and annual basis.

90.     For example, for the time period March 2014 to February 2015, the HCA monitoring reports listed Dr. Ruiz's total inpatient admissions as 444 and total outpatient cases as 220.

91.     The HCA monitoring reports also listed the "Top Ten Consulting Physicians Used" and the "Top Ten Consulting Specialties Used" by Dr. Ruiz and the case counts for each physician and specialty consulted.

92.     The HCA monitoring reports listed the numbers and types of procedures Dr. Ruiz performed or ordered both for inpatients and outpatients.

93.     The monitoring reports also listed the cases per payer type for each physician.

94.     The most detailed data in the HCA monitoring reports concerned observation cases. Observation cases indicate a physician's decision not to admit a patient. As previously noted, observation cases generate less revenue for hospitals than inpatient admissions.  As will be shown, the HCA data targeted physicians'

decisions to observe rather than admit – decisions that HCA penalized in their physician retention practices.

95.    The monitoring reports listed the following data for each physician: the observation case counts, the average observation charges, observation length of stay in hours, above average observation length of stay in hours, observation cases over 24 hours, above average observation charges, and top 10 observation primary diagnoses.[2]

96.    With respect to these data points, the monitoring reports compared Dr. Ruiz's numbers with the overall average numbers for all other hospitalists within the HCA East Florida Division. For each category, the monitoring reports provided a scale grading the hospitalist's level of performance as a numerical standard deviation. If a hospitalist was above 1 standard deviation from other

---

[2]    One of the data points in the HCA monitoring reports for every hospitalist within HCA East Florida hospitals was the "Top 10 Observation Primary Diagnoses." Through their constant monitoring reports, HCA East Florida executives determined that the following codes or diagnoses were commonly used as a basis for observation status: chest pain NEC (ICD 9 Code 786.59), chest pain NOS (ICD 9 Code 786.50), syncope and collapse (ICD 9 Code 780.2), hypertension (ICD 9 Code 401.9), dizziness and giddiness (ICD 9 Code 780.4), and headache (784.0).

HCA East Florida hospital administrators monitored the leading diagnosis codes for observation cases and directed hospitalists to use these codes to support inpatient admissions instead of observation status. Between 2010 and 2015, Medicare inpatient admissions based on these common diagnoses increased dramatically at HCA East Florida hospitals as discussed below.

hospitalists in the HCA East Florida Division, then the scale presented a red warning message. If a hospitalist was above .5 standard deviations from other hospitalists in the HCA East Florida Division, then the scale presented a yellow warning message.

97.    For the time period March 2014 to February 2015, the HCA monitoring reports listed Dr. Ruiz's observation case count as 74. The average observation charges were $37,565--- 1.72 standard deviations over the average observation charges for all hospitalists within the HCA East Florida Division. Consequently, that data point contained a red warning graph on Dr. Ruiz's report.

98.    Among Dr. Ruiz's observation cases, 72.86% had above average length of stays as compared to all hospitalists within the HCA East Florida Division.  Dr. Ruiz's above average observation length of stay cases placed him 7.55 standard deviations above the average for HCA East Florida hospitalists. Dr. Ruiz's report contained another red warning graph for this data point.

99.    Another data point evaluated the number of Dr. Ruiz's observation cases over 24 hours. According to the monitoring report, 52 of 70 cases met this criterion. Such cases were 4.03 standard deviations over the average for all other HCA East Florida

hospitalists. Consequently, Dr. Ruiz's monitoring report contained another red warning graph for this data point.

100. With respect to above average observation charges, Dr. Ruiz was 3.16 standard deviations above the average for HCA East Florida hospitalists. He received another red warning message with respect to this data point.

**The Monitoring Reports Functioned as Quotas for Hospitalists**

101. These report cards communicated the constant message to hospitalists that HCA administrators were scrutinizing the numbers of their inpatient admissions, their numbers of referrals to HCA employed specialists, their numbers of observation cases, the length of such observations cases, the charges for such observation cases, and the diagnoses associated with such observation cases.

102. The report cards' benchmarks functioned as quotas in each category with the hospitalists competing against each other and being compared against each other every month with warning messages about any deviation above .5 standard deviations from all other hospitalists within the HCA East Florida Division. Hospitalists with any numbers beyond 1 standard deviation would

receive reprimands from Aventura's administration and threats of termination.

103.     HCA's monitoring reports resulted in decreased observation cases and a corresponding increase in the more-profitable admissions. The observation case data for the Aventura Hospitalists Group evidence this fact.

104.     As a group, the Aventura hospitalists' observation charges, observation length of stay, above average observation length of stay, observation over 24 hours, and above average observation charges all fell below the averages for HCA East Florida hospitalists.

105.     During the time period of March 2014 to February 2015, Aventura hospitalists' overall average observation charges fell to 1.59 standard deviations below the average for all hospitalists in HCA East Florida. The Aventura hospitalists' above average observation length of stay fell to .42 standard deviations below the average for all hospitalists in the HCA East Florida Division. The Aventura hospitalists' observation cases over 24 hours stay fell to .61 standard deviations below the average for all hospitalists in the HCA East Florida Division. And the Aventura hospitalists' above

average observation charges fell to .67 standard deviations below the average for all hospitalists in the HCA East Florida division.

106.    This same trend continued in the following year with observation data points falling even further.  From March 2015 to February 2016, the Aventura hospitalists' observation charges, observation length of stay, above average observation length of stay, observation over 24 hours, and above average observation charges fell further below the averages for HCA East Florida hospitalists. The Aventura hospitalists' average observation length of stay fell to 1.59 standard deviations below the average for all hospitalists in HCA East Florida. The Aventura hospitalists' above average observation length of stay fell to .78 standard deviations below the average for all hospitalists in the HCA East Florida Division. The Aventura hospitalists' observation cases over 24 hours stay fell to .87 standard deviations below the average for all hospitalists in the HCA East Florida Division. And the Aventura hospitalists' above average observation charges fell to .85 standard deviations below the average for all hospitalists in the HCA East Florida Division.

107.   As Aventura hospitalists felt HCA's intense scrutiny of observation cases, inpatient admissions dramatically increased as discussed below. The continuous aggressive scrutiny and discouragement of a physician's decisions to recommend observation over admission at Aventura was part of HCA's strategy to induce physicians not to order observation status and instead order inpatient admission to the hospital.

## HCA Administrators Directed Hospitalists to Increase Inpatient Admissions and Decrease Observation Cases

108.   Prior to Dr. Ruiz, the previous physician who had the Preferred Care and Medica Health HMO contracts placed most Medicare patients in inpatient status. This was financially beneficial for the hospital but the Aventura administrators noticed that once Dr. Chirino and Dr. Ruiz began working that the observation cases increased and the inpatient admissions decreased.

109.   With their extensive program to monitor inpatient admissions and observation cases, HCA administrators at Aventura were not pleased with the reduction in inpatient admissions and consequent reductions in hospital revenues. Consequently, they scheduled multiple meetings with Dr. Ruiz and other hospitalists and directed

these physicians to increase their inpatient admissions and move more observation cases to inpatient status.

110.    In April of 2015, Aventura's former Chief Medical Officer, Dr. Sebastian Strom, created a separate monitoring profile that specifically tracked inpatient and observation case data for Dr. Ruiz and Preferred Care Partners.  This custom profile was in addition to the numerous systematic profiles used by HCA East Florida administrators to track inpatient admission and observation data for all physicians at all hospitals within that Division.

111.    On April 13, 2015, Theresa Caruso, the Executive Assistant to Dianne Goldenberg, Aventura's Chief Executive Officer, sent an email to Dr. Ruiz and other hospitalists stating that Goldenberg wanted to have a meeting regarding "observation management." These meetings were scheduled on a quarterly basis.

112.    The following individuals were invited to these meetings:

> Dr. Darilo Chirino and Dr. Camilo Ruiz (Preferred Care Partners)
> Dr. Hamid Feiz  (AHMC Hospitalist & GME Programs)
> Dr. Venkat Kalidindi  (EmCare)
> Dr. Brigido Legaspi and/or Dr. Christine Rice (IPC)
> Dr. Francisco Molina  (FLACS / Team Health)
>
> Dr. Manuel Anton (Chief Medical Officer of the HCA East Florida Division)
> Dianne Goldenberg (Aventura's Chief Executive Officer)

Dr. Sebastian Strom (Aventura's Chief Medical Officer)
Alias Bert (Aventura's Chief Financial Officer)

113.    Dr. Manuel Anton was and is the Chief Medical Officer of the HCA East Florida Division. The East Florida Division is composed of 14 HCA hospitals discussed further below.

114.    At these meetings, Goldenberg and Bert provided Dr. Ruiz and other physicians with reports tracking the numbers of their observation and inpatient cases, explained how they would penalize physicians for observation cases, and directed the physicians to move more cases from observation status to inpatient status and increase the numbers of inpatient admissions. During the meeting Goldenberg stated that there would be a "day of reckoning" for the physicians who did not follow HCA's directives.

115.    On September 17, 2015, Dr. Strom, Dianne Goldenberg, and Elisa Bert met with Dr. Ruiz and again directed him to move more patients into inpatient status. At this meeting, Dr. Strom stated to Dr. Ruiz,  "Physicians that do not change patients into inpatient status as expected will be taken to a peer review process with letters placed in their physician quality files."

116.    On December 17, 2015, Dr. Strom and Elisa Bert met with Dr. Ruiz to discuss again HCA's directive to move more patients into

inpatient status. Dr. Strom met with Dr. Ruiz again on December 22, 2015 concerning his management of observation cases. During this private meeting Dr. Strom complained about the fact that he was facing higher rates of denials of inpatient claims from Medicare HMO payers (Preferred and Medica) and that he required increased documentation to legitimize inpatient rates and expedite the appeals process. Also, he directed Dr. Chirino and Dr. Ruiz to participate in phone conferences with him and the insurance medical directors to provide further evidence to approve inpatient rates for the hospital.

117.    On March 24, 2016, Dr. Strom and Elisa Bert again met with Dr. Ruiz to discuss again HCA's directive to move more patients into inpatient status and newly instituted point system to penalize doctors. At this meeting, Dr. Strom and Ms. Bert gave a report to Dr. Ruiz called "Aventura UM Committee Report" for the February 2015-January 2016 time period.

118.    This report evaluated 349 inpatient cases and 258 outpatient cases in which Dr. Ruiz was the attending physician.

119.    The report first listed various data points concerning Dr. Ruiz's inpatient cases: case mix index, patient age, average risk of

mortality level, and average severity level. For each category, the report listed the results for Dr. Ruiz's inpatient cases and then provided a statistical comparison to all other hospitalists within HCA East Florida hospitals.

120.    The Aventura UM Committee Report listed Dr. Ruiz's average inpatient age as 71.7 compared to the average inpatient age of 64.9 for all other hospitalists within HCA East Florida hospitals. The Report listed a standard deviation of 4.25 for this category.

121.    The Report listed the "Average Risk of Mortality Level" for Dr. Ruiz's inpatients as 2.01 as compared to 1.82 for all other hospitalists within HCA East Florida hospitals. The standard deviation listed was 1.73.

122.    The Report also listed the "Average Severity Level" for Dr. Ruiz's inpatients as 2.18 as compared to 2.08 for all other hospitalists within HCA East Florida hospitals. The standard deviation listed was 0.84.

123.    The Report then listed the average length of stay for Dr. Ruiz's inpatients as 5.77 compared to 5.18 for all other hospitalists within HCA Florida East hospitals. The Report listed the standard deviation was 1.28.

124. The Report also listed the "% of Cases Above Average Length of Stay" as 46.42% for Dr. Ruiz compared to the overall average of 37.74% for all other hospitalists within HCA East Florida hospitals. The Report listed Dr. Ruiz's standard deviation in this category as 1.78.

125. At this meeting, Dr. Strom and Ms. Bert criticized Dr. Ruiz for having inpatients with average lengths of stay above the average benchmarks for other hospitalists within HCA East Florida hospitals. HCA-Aventura's administrators demanded that Dr. Ruiz and other hospitalists move patients into inpatient status and then quickly discharge them out of the hospital. The reason for this demand was that reimbursement was significantly higher for inpatient admissions as compared to outpatient visits but reimbursement was generally not higher for longer lengths of inpatient stays. For inpatient admissions, hospitals are generally paid based on the diagnosis-related group (DRG), not the length of stay.

126. The Aventura UM Committee Report given to Dr. Ruiz also listed his "average observation length of stays (hours)" as 34.85 as compared to an average of 27.35 for all other hospitalists within

HCA East Florida hospitals. The standard deviation listed was 2.81. The percentage of observation length of stays over 24 hours was 65.04% compared to the average of 47.78 for all other hospitalists. The standard deviation was 1.96.

127.    Dr. Strom and Ms. Bert focused on these observation cases in their discussion with Dr. Ruiz and told him that he was required to move more patients into inpatient status instead of observation status.

128.    Dr. Strom and Ms. Bert also provided graphs that tracked Dr. Ruiz's average observation length of stay, average inpatient length of stay, and average consultants used for the time period of January 2015 through December 2015. HCA-Aventura administrators used this data to direct Dr. Ruiz to move more patients into inpatient status, use more consultants for "treating" inpatients, and then quickly move the inpatients out of the hospital because longer lengths of stay resulted in higher costs but generally not higher reimbursement.

129.    In that same month---March of 2016---Aventura administrators intensified the pressure on physicians even higher with the "New Point System for Medical Staff Membership." Under this Point

System published by the Aventura CEO to all physicians on medical staff, "1 point is assessed after each consecutive month that a provider has a monthly average length of stay that is 1 or more standard deviations higher than that of the peer group." "A total of 2 points will be assessed in the event that the provider's length of stay for the consecutive outlier month is 2 or more standard deviations higher than that of the peer group."

130.    The Point System rules provide that "[p]oints automatically expire after 1 year."  "Additionally, providers have the opportunity to expunge points early through voluntary participation in education activities or through sustained improvements in performance."

131.    Under the Aventura Point System, physicians with unexpired points faced escalating penalties based on the number of their points, including non-renewal of staff membership and revocation of medical staff membership.

132.    With Dr. Ruiz's average length of stay for observation cases being at a level of 2.81 standard deviations above the average for other hospitalists within the HCA East Florida division according to the Aventura UM Committee Report, he would be assessed 2 points for every consecutive month that his standard deviation exceeded 2

in this category. If he accumulated 4 points in this category, he would face non-renewal of medical staff membership. If he accumulated 5 or more points in this category, he would face revocation of medical staff membership and privileges.

133.     For physicians facing the economic pressures of job security exerted by HCA administrators, the easiest solution was to move patients into inpatient status and then quickly discharge them and not face HCA's punitive scrutiny of observation cases. This consequence was the underlying objective of HCA East Florida administrators.   As discussed below, that is exactly what has happened at HCA East Florida hospitals over the last five years.

134.     The HCA-Aventura executives met with multiple hospitalists groups (IPC, TeamHealth/FLACS, and EmCare) to communicate the same message of directing the physicians to move more patients from observation status to inpatient status.

135.     Some HCA physicians and staff members protested these practices and procedures and then quit or had their positions terminated by Defendants. Others acquiesced to protect their salaries.

136.   The IPC group did not follow the Aventura administrators'
mandates and that group was removed from the medical staff at
Aventura.

## HCA Has Implemented Intrusive Strategies to Monitor and Manage Patient Admissions and Discharges Based on Reimbursement Objectives

137.   At Aventura Hospital patient discharges operate under two
different administrative rules. For observation cases and outpatient
cases, delays in discharge are acceptable and abused to roll patients
into inpatient status. For inpatient cases, delays in discharge are not
acceptable and physicians are criticized and penalized for delays.

138.   In numerous cases Dr. Ruiz discharged patients from outpatient
visits yet administrative issues delayed their discharges and
Aventura's administration classified and billed these patient visits
as inpatients admissions. In other instances, administrative issues
delayed inpatient discharges and Dr. Ruiz sent emails to the
Aventura CEO, Dianne Goldenberg, and the Aventura Chief
Medical Officer, Dr. Strom, because of the adverse consequences to
Dr. Ruiz from HCA's aggressive monitoring system. Dr. Ruiz and
other hospitalists were under constant and intense pressure to move

observation cases into inpatient status and move inpatients out of the hospital.

139.    Dr. Ruiz and Dr. Chirino received regular communications from administrative case managers regarding observation cases. Their questions and requests were usually designed to steer observation patients into inpatient status.

140.    Case managers at Aventura have also routinely sent preprinted faxes to hospitalists and attending primary care physician stating, "You are currently out of compliance with Medicare" and directing the hospitalists to sign a Medicare Order Form with a pre-checked box that states "Admit to inpatient status." Above the pre-checked box is a preprinted statement: "I expect the patient will require hospital care for TWO MIDNIGHTS OR MORE. (Documentation must be present in the medical record to support the expectation of two or more midnights.)."

141.    Dr. Ruiz has routinely received this form from case managers at Aventura even in situations when the patient was not in the hospital for any period of time close to two midnights and even when Dr. Ruiz did not expect the patient to be in the hospital for two midnights. Yet Aventura's case managers have routinely sent this

fax warning Dr. Ruiz and other physicians, "You are currently out of compliance with Medicare. Please sign the attached Medicare Order form and fax back to: 305-682-7031."

142.    Dr. Ruiz sought to place patients in the appropriate observation or inpatient status. However, Aventura's administration continued to communicate the message that his observation cases were too high in number and his inpatient admissions were too low. When Dr. Ruiz refused to alter his independent judgment regarding a patient's status, Aventura's administrators have attempted to remove Dr. Ruiz from the medical staff.

143.    Aventura's administrators want to remove Dr. Ruiz and Dr. Chirino from the medical staff and then transfer more HMO Medicare contracts to the EmCare hospitalist group controlled by the hospital administration.

144.    The Aventura administration resorted to using peer review letters to document contrived criticisms of Dr. Ruiz's patient care. On September 28, 2016 and October 5, 2016 Dr. Ruiz received two separate quality review letters. Neither had any substantive merit.

145.    As discussed below, HCA's tactics have led to dramatic increases in Medicare inpatient admissions as compared to national

and Florida norms and as compared to every other hospital system in the United States.

## Aventura Hospital's Inpatient Admissions Have Escalated to Extraordinary Levels

146.    From his experience working at Aventura Hospital, Dr. Ruiz identified seven categories of common diagnoses monitored by Aventura and HCA East Florida administrators to push patients into inpatient status over the last five years. These codes are as follows:

| Group 1--General codes | ICD 9 | ICD 10 |
| --- | --- | --- |
| Fever | 780.60 | R50.9 |
| Weakness | 780.79 | R53.1 |
| Fatigue | 780.79 | R53.81, R53.83 |
| | | |
| **Group 2---Neurology** | | |
| Transient ischemic attack | 435.9 | G45.9 |
| Paresthesias | 782.0 | R20.2 |
| Headaches | 784.0 | R51 |
| Dizziness | 780.4 | R42 |
| Syncope | 780.2 | R55 |
| | | |
| **Group 3---Cardiovascular** | | |
| Chest pain | 786.50 | R07.9 |
| Palpitations | 785.1 | R00.2 |
| Coronary art disease | 414.01 | I25.10 |
| | | |
| **Group 4---Pulmonary** | | |
| Cough | 786.2 | R05 |
| Dyspnea | 786.09 | R06.00 |
| Asthma | 493.00, 493.10 | J45.20, J45.31 |

**Group 5---Gastroenterology**

| Gastroenteritis | 009.0 | A09 |
|---|---|---|
| Diverticulitis | 562.11 | K57.32 |
| Diarrhea | 787.91 | R19.7 |
| Nausea/vomiting | 787.01 | R11.2 |
| Rectal bleeding | 569.3 | K62.5 |

**Group 6---Urology/Renal**

| Hematuria | 599.71 | R31.0, R31.9 |
|---|---|---|
| Nephrolithiasis | 592.0 | N20.0 |
| Acute renal failure | 584.9 | N17.9 |

**Group 7---Musculoskeletal**

| Muscle spasm | 728.85 | M62.40 |
|---|---|---|
| Low back pain | 724.2 | M54.5 |
| Lumbar strain | 847.2 | S33.5XXA |
| Cervical strain | 847.0 | S13.4XXA |

147.    At the vast majority of hospitals in the United States, most of these diagnosis codes are usually treated on an outpatient basis. The opposite picture emerges at Aventura Hospital, HCA East Florida hospitals, and other HCA hospitals discussed below.  At these HCA hospitals, most of these diagnosis codes commonly result in inpatient admissions.

148.    With respect to these diagnosis codes, over the last five years most HCA East Florida hospitals have increased their Medicare inpatient admission claims to levels that are at least double or triple

the national average[3] of Medicare inpatient admissions associated with these same codes.

149. The HCA East Florida Division is composed of 14 hospitals: Aventura Hospital and Medical Center, JFK Medical Center, JFK Medical Center North, Kendall Regional Medical Center, Lawnwood Regional Medical Center, Mercy Hospital, Northwest Medical Center, Palms West Hospital, Plantation General Hospital, Raulerson Hospital, Sister Emmanuel Hospital, St. Lucie Medical Center, University Hospital & Medical Center, and Westside Regional Medical Center.

150. The following discussion addresses the escalation in Medicare inpatient admissions at Aventura Hospital and other HCA East Florida hospitals.

---

[3] The national data analyzed in this case included the Medicare claims data submitted by approximately 3,220 short-term acute care hospitals, commonly referred to by CMS as "STACs." The analyses of national Medicare claims data included every fiscal year from 2009-2015. The outpatient data in 2015 included nine months through September of 2015 when the ICD 9 diagnosis codes were converted to ICD 10 diagnosis codes. The 2015 outpatient data based on ICD 9 diagnosis codes was annualized for a full year. The inpatient MedPAR data is on the federal fiscal year ending September 30. ICD 10 took effect on October 1, 2015. The 2015 Medicare inpatient data included a complete 12 months under ICD 9.

151.   Extensive analyses of Aventura Hospital's and other HCA East Florida hospitals' claims to Medicare based on these diagnosis codes further evidence and confirm HCA's illegal schemes identified by Dr. Ruiz and their detrimental impact on the Medicare Program.

152.   Dr. Ruiz has provided the Department of Justice with detailed data concerning the inpatient and outpatient Medicare claims by HCA East Florida hospitals. The data includes the following for each East Florida hospital from 2009-2015: inpatient Medicare cases for each group of diagnosis codes, outpatient Medicare cases for each group of diagnosis codes, average inpatient and outpatient Medicare payments for each group of diagnosis codes and the payment differential, Medicare inpatient admission percentages and Medicare outpatient status for each group for diagnosis codes, national average Medicare inpatient and outpatient percentages for each group of diagnosis codes, the 7-year average Medicare payment differential between outpatient and inpatient status for each group of codes, the 7-year average total Medicare cases, the 7-year average Medicare inpatient percentage for each group of codes, and average damages to the Medicare Program per year.

**Aventura's Inpatient Admissions Associated with Fever, Weakness, and Fatigue Increased to Nearly 600 Percent Above National and Florida Averages**

153.    Group One codes are the general codes of fever, weakness, and fatigue. Medicare inpatient admissions associated with these common clinical conditions at Aventura Hospital have escalated to levels 575% over the national averages.

154.    For example, in 2012 the national average of Medicare inpatient admissions associated with these codes was 10.8 percent. At non-HCA Florida hospitals in 2012, Medicare inpatient admissions associated with these codes was 8.7 percent. Yet at Aventura Hospital in 2012, Medicare inpatient admissions associated with these codes was 42.6 percent.

155.    The trend worsened in subsequent years. In 2013, the national average of Medicare inpatient admissions associated with these codes was 11.1 percent. At non-HCA Florida hospitals in 2013, Medicare inpatient admissions associated with these codes was 9.4 percent. Yet at Aventura Hospital in 2013, Medicare inpatient admissions associated with these codes was 48.0 percent.

156.    In 2014 the national average of Medicare inpatient admissions associated with these codes was 11.0 percent. At non-HCA Florida

hospitals in 2014, Medicare inpatient admissions associated with these codes was 10.1 percent. Yet at Aventura Hospital in 2014, Medicare inpatient admissions associated with these codes was 63.3 percent.

157.    In 2015, the national average of Medicare inpatient admissions associated with these codes was 11.0 percent. At non-HCA Florida hospitals in 2015, Medicare inpatient admissions associated with these codes was 10.4 percent.  Yet at Aventura Hospital in 2015, Medicare inpatient admissions associated with these codes was 47.0 percent.

158.    From 2012 through 2015, the national average of Medicare inpatient admissions associated with these diagnoses codes stayed steady at approximately 11 percent. At non-HCA Florida hospitals, the inpatient percent stayed steady at 9-10 percent. Yet at Aventura Hospital, the Medicare inpatient admissions associated with one of these codes were at least 400 percent over these national averages and Florida averages and escalated to nearly 600 percent over the national average and Florida average[4] in 2014.

_____

[4] In this Complaint, the "Florida average" refers to non-HCA hospitals located in Florida.

## Aventura's Inpatient Admissions Associated with Muscle Spasm, Low Back Pain, Lumbar Strain, and Cervical Strain Have Increased to Levels 400-500 Percent Over National Averages

159.    Group Seven codes are the general codes of muscle spasm, low back pain, lumbar strain, and cervical strain. Since 2011, Medicare inpatient admissions associated with these common clinical conditions at Aventura Hospital have escalated to levels approximately 500 percent over national averages.

160.    For example, in 2012 the national average of Medicare inpatient admissions associated with these common symptoms was 9 percent. At non-HCA Florida hospitals in 2012, Medicare inpatient admissions associated with these codes was 9.9 percent. Yet at Aventura Hospital in 2012, Medicare inpatient admissions associated with these codes was 36.0 percent.

161.    The trend worsened in subsequent years. In 2013, the national average of inpatient admissions associated with these codes was 8.7 percent. At non-HCA Florida hospitals in 2013, Medicare inpatient admissions associated with these codes was 9.5 percent. Yet at Aventura Hospital in 2013, 38.0 percent of Medicare patients with one of these diagnoses codes were admitted as inpatients.

162.    In 2014 the national average of inpatient admissions associated with these codes was 8.4 percent. At non-HCA Florida hospitals in 2014, Medicare inpatient admissions associated with these codes was 9.5 percent. Yet at Aventura Hospital in 2014, Medicare inpatient admissions associated with these codes was 41.2 percent.

163.    In 2015, the national average of Medicare inpatient admissions associated with these codes was 8.6 percent. At non-HCA Florida hospitals in 2015, Medicare inpatient admissions associated with these codes was 10.0 percent. Yet at Aventura Hospital in 2015, Medicare inpatient admissions associated with these codes was 30.6 percent

164.    From 2012 through 2015, the national average of Medicare inpatient admissions associated with these diagnoses codes stayed steady at approximately 9 percent and the average among non-HCA Florida hospitals stayed steady at 9-10 percent. Yet at Aventura Hospital, Medicare inpatient admissions associated with one of these codes were 400-500 percent over national and Florida averages.

## Aventura's Inpatient Admissions Associated with Cough, Dyspnea, and Asthma Increased by 747 Percent

165.    Group Four codes are the common conditions of cough, dyspnea (shortness of breath), and asthma. These conditions are common in the Medicare population and usually treated on an outpatient basis.

166.    Nationally between 2010 and 2015, inpatient admissions associated with these common diagnosis codes stayed steady at approximately 4 percent. At non-HCA Florida hospitals, Medicare inpatient admissions associated with these codes likewise stayed steady at 4 percent.  But not at Aventura Hospital where Medicare inpatient admissions associated with these common codes have risen sharply.

167.    At Aventura Hospital, Medicare inpatient admissions associated with these codes moved from 5.9 percent in 2010 to 20.6 percent in 2012. The trend worsened in subsequent years.

168.    In 2013, the national average of Medicare inpatient admissions associated with these codes was 4.3 percent. At non-HCA Florida hospitals in 2013, Medicare inpatient admissions associated with these codes was 4.8 percent. Yet at Aventura Hospital in 2013, 27.5

percent of Medicare patients with one of these diagnoses codes were admitted as inpatients.

169.    In 2014 the national average of Medicare inpatient admissions associated with these codes was 4.0 percent. At non-HCA Florida hospitals in 2014, Medicare inpatient admissions associated with these codes was 4.7 percent. Yet at Aventura Hospital in 2014, Medicare inpatient admissions associated with these codes was 40.4 percent.

170.    In 2015, the national average of Medicare inpatient admissions associated with these codes was 3.9 percent. At non-HCA Florida hospitals in 2015, Medicare inpatient admissions associated with these codes was 4.7 percent. Yet at Aventura Hospital in 2015, Medicare inpatient admissions associated with these codes was 44.1 percent.

171.    From 2010 through 2015, the national average and Florida average of Medicare inpatient admissions associated with these diagnoses codes stayed steady at approximately 4 percent. Yet at Aventura Hospital, Medicare inpatient admissions associated with these codes moved from 5.9 percent in 2011 to 40.4 percent in 2014

and 44.1 percent in 2015. This represents an increase of 747 percent at this hospital.

172.    At Aventura Hospital, Medicare inpatient admissions associated with one of these codes increased to 1000 percent over national and Florida averages in 2014 and 1100 percent over national and Florida averages in 2015.

**Aventura's Inpatient Admissions Based on Common Cardiovascular Codes Have Increased to Over Double National and Florida Averages**

173.    Group Three codes are the common cardiovascular codes of chest pain, palpitations, and coronary artery disease. Since 2011 at Aventura, Medicare inpatient admissions associated with these common cardiovascular conditions in the Medicare population have escalated to levels over double the national and Florida averages.

174.    For example, in 2012 the national average of Medicare inpatient admissions associated with these common codes was 33.6 percent. At non-HCA Florida hospitals in 2012, Medicare inpatient admissions associated with these codes was 36.9 percent. Yet at Aventura Hospital in 2012, 69.6 percent of Medicare patients with one of these diagnosis codes were admitted as inpatients.

66

175.   The trend worsened in subsequent years. In 2013, the national average of inpatient admissions associated with these codes was 33.2 percent. At non-HCA Florida hospitals in 2013, Medicare inpatient admissions associated with these codes was 37.1 percent. Yet at Aventura Hospital in 2013, Medicare inpatient admissions associated with these codes was 73.8 percent.

176.   In 2014 the national average of inpatient admissions associated with these codes was 31.3 percent. At non-HCA Florida hospitals in 2014, Medicare inpatient admissions associated with these codes was 36.4 percent. Yet at Aventura Hospital in 2014, Medicare inpatient admissions associated with these codes was 74.6 percent.

177.   In 2015, the national average of Medicare inpatient admissions associated with these codes was 30.6 percent. At non-HCA Florida hospitals in 2015, Medicare inpatient admissions associated with these codes was 35.6 percent. Yet at Aventura Hospital in 2015, 74.7 percent of Medicare patients with one of these diagnoses codes were admitted as inpatients.

178.   From 2012 through 2015, the national average of Medicare inpatient admissions associated with these diagnosis codes declined from 33.6 percent to 30.6 percent. Yet at Aventura Hospital, the

Medicare inpatient admissions associated with one of these codes increased from 69.6 percent to 74.7 percent.

179.    By admitting these Medicare patients as inpatients, Aventura Hospital on average obtained increased Medicare payments of approximately $8.7 million each year.

**Aventura's Inpatient Admissions Associated with Common Neurology Codes Have Increased to 400 Percent Above National Averages**

180.    Group Two codes are the common neurology codes of headache, dizziness, syncope (fainting), paresthesias (tingling), and transient ischemic attack. Since 2011, Medicare inpatient admissions associated with these common neurology codes at Aventura Hospital have escalated to levels approximately 400 percent over the national averages.

181.    For example, in 2012 the national average of Medicare inpatient admissions associated with these common neurology codes was 15.4 percent. At non-HCA Florida hospitals in 2012, Medicare inpatient admissions associated with these codes was 18.7 percent. Yet at Aventura Hospital in 2012, these codes were associated with inpatient admission rates of 44.2 percent.

182. The trend worsened in subsequent years. In 2013, the national average of inpatient admissions associated with these neurology codes was 14.4 percent. At non-HCA Florida hospitals in 2013, Medicare inpatient admissions associated with these codes was 17.7 percent. Yet at Aventura Hospital in 2013, Medicare inpatient admissions associated with these codes was 48.4 percent.

183. In 2014 the national average of inpatient admissions associated with these neurology codes was 13.1 percent. At non-HCA Florida hospitals in 2014, Medicare inpatient admissions associated with these codes was 17.1 percent. Yet at Aventura Hospital in 2014, Medicare inpatient admissions associated with these codes was 51.3 percent.

184. In 2015, the national average of Medicare inpatient admissions associated with these neurology codes was 12.6 percent. At non-HCA Florida hospitals in 2015, Medicare inpatient admissions associated with these codes was 16.7 percent. Yet at Aventura Hospital in 2015, Medicare inpatient admissions associated with these codes was 52.1 percent.

185. From 2012 through 2015, the national average of Medicare inpatient admissions associated with these neurology diagnoses

codes declined from 15.4 percent to 12.6. Yet at Aventura Hospital, the Medicare inpatient admissions associated with one of these codes increased to in excess of 400 percent over national averages and approximately 325 percent over Florida averages.

**Aventura's Admission Rates Based on Common Gastroenterology Codes Increased to Approximately 300 Percent Above National Averages**

186. Group Five codes include the common gastroenterology codes of gastroenteritis, diverticulitis, diarrhea, nausea/vomiting, and rectal bleeding. Since 2011, Medicare inpatient admissions associated with these common gastroenterology codes at Aventura Hospital have escalated to levels approximately 300 percent over national averages.

187. For example, in 2012 the national average of Medicare inpatient admissions associated with these common gastroenterology codes was 24.4 percent. At non-HCA Florida hospitals in 2012, Medicare inpatient admissions associated with these codes was 26.8 percent. Yet at Aventura Hospital in 2012, these codes were associated with inpatient admission rates of 60 percent.

188.    The trend worsened in subsequent years. In 2013, the national average of inpatient admissions associated with these gastroenterology codes was 23.9 percent. At non-HCA Florida hospitals in 2013, Medicare inpatient admissions associated with these codes was 27.1 percent. Yet at Aventura Hospital in 2013, Medicare inpatient admissions associated with these codes was 63 percent.

189.    In 2014 the national average of inpatient admissions associated with these neurology codes was 22.9 percent. At non-HCA Florida hospitals in 2014, Medicare inpatient admissions associated with these codes was 27.1 percent. Yet at Aventura Hospital in 2014, Medicare inpatient admissions associated with these codes was 66.7 percent.

190.    In 2015, the national average of Medicare inpatient admissions associated with these gastroenterology codes was 22.1 percent. At non-HCA Florida hospitals in 2015, Medicare inpatient admissions associated with these codes was 26.4 percent. Yet at Aventura Hospital in 2015, Medicare inpatient admissions associated with these codes was 59.7 percent.

## Aventura's Overall Rates of Inpatient Admissions Escalated to Triple National Averages

191.   At Aventura Hospital in 2013, overall these seven categories of common diagnosis codes were associated with an inpatient admission rate of 61.7 percent as compared to the national average of 22.2 percent and Florida average of 24.7 percent.

192.   At Aventura in 2014, overall these seven categories of common diagnosis codes were associated with an inpatient admission rate of 63.9 percent as compared to the national average of 21.1 percent and Florida average of 24.5 percent.

193.   In 2015, overall these seven categories of common diagnosis codes were associated with an inpatient admission rate of 62.4 percent of the time as compared to the national average of 20.9 percent and Florida average of 24.7 percent. Aventura's rates of Medicare inpatient admissions based on these diagnosis codes have been approximately triple the national average.

194.   By admitting these Medicare patients as inpatients, Aventura Hospital on average obtained increased Medicare payments of approximately $18.4 million each year.

## HCA East Florida Overall Inpatient Admissions Based on Seven Categories of Diagnostic Codes Have Increased to Levels That Are at Least Double or Triple National Averages

195. HCA East Florida executives implemented centralized monitoring and enforcement systems to increase inpatient admissions at all hospitals throughout the East Florida Division. For the time period of 2011-2015, major escalations in Medicare inpatient admission rates associated with these same diagnosis codes can be seen at nearly every hospital within the HCA East Florida Division. The escalation in inpatient admissions was a coordinated strategy by executives of the HCA East Florida Division. Examples are provided below.

### Kendall's Overall Rates of Inpatient Admissions Escalated to Triple the National Average

196. At Kendall Regional in 2010, overall these seven categories of common diagnosis codes were associated with an inpatient admission rate of 39.3 percent as compared to the national average of 27.1 percent and Florida average of 31.1 percent. Yet by 2014, overall these seven categories of common diagnosis codes were associated with an inpatient admission rate of 58.6 percent as

73

compared to the national average of 21.1 percent and Florida average of 24.5 percent.

197.    In 2015, these seven categories of common diagnosis codes were associated with an inpatient admission rate of 63.3 percent as compared to the national average of 20.9 percent and Florida average of 24.7 percent. Kendall Regional's rates of inpatient admissions based on these diagnosis codes have increased to approximately triple the national average.

198.    By admitting these Medicare patients as inpatients, Kendall Regional obtained increased Medicare reimbursement of approximately $11.6 million each year.

**Palm West's Overall Rates of Inpatient Admissions Escalated to More Than Triple the National Average**

199.    At Palms West Hospital in 2013, overall these seven categories of common diagnosis codes were associated with an inpatient admission rate of 68.0 percent as compared to the national average of 22.2 percent and Florida average of 24.7 percent.

200.    In 2014 at Palms West, overall these seven categories of common diagnosis codes were associated with an inpatient

admission rate of 73.5 percent as compared to the national average of 21.1 percent and Florida average of 24.5 percent.

201.    In 2015 at Palms West, these seven categories of common diagnosis codes were associated with an inpatient admission rate of 73.1 percent as compared to the national average of 20.9 percent and Florida average of 24.7 percent.

202.    Palms West's rates of Medicare inpatient admissions based on these diagnosis codes have exceeded triple the national average.

203.    By admitting these Medicare patients as inpatients, Palms West obtained increased Medicare payments of approximately $6.1 million each year.

## St. Lucie's Overall Rates of Inpatient Admissions Exceeded Triple the National Average

204.    At St. Lucie Medical Center in 2013, overall these seven categories of common diagnosis codes were associated with an inpatient admission rate of 62.5 percent as compared to the national average of 22.2 percent and Florida average of 24.7 percent.

205.    In 2014 at St. Lucie, overall these seven categories of common diagnosis codes were associated with an inpatient admission rate of

64.7 percent as compared to the national average of 21.1 percent and Florida average of 24.5 percent.

206.    In 2015 at St. Lucie, these seven categories of common diagnosis codes were associated with an inpatient admission rate of 64.5 percent as compared to the national average of 20.9 percent and Florida average of 24.7 percent.

207.    St. Lucie's rates of Medicare inpatient admissions based on these diagnoses codes have exceeded triple the national average.

208.    By admitting these Medicare patients as inpatients, St. Lucie obtained increased Medicare payments of approximately $11.4 million each year.

**Westside's Overall Rates of Inpatient Admissions Escalated to Triple the National Average**

209.    At Westside Regional Medical Center in 2012, overall these seven categories of common diagnosis codes were associated with an inpatient admission rate of 49.8 percent as compared to the national average of 22.5 percent and Florida average of 24.8 percent. This level was over double the national average of Medicare inpatient admissions using these common diagnosis

codes. Yet in subsequent years the Medicare inpatient percentages escalated higher to triple the national averages.

210. At Westside Regional in 2013, overall these seven categories of common diagnosis codes were associated with an inpatient admission rate of 61.7 percent as compared to the national average of 22.2 percent and Florida average of 24.7 percent.

211. In 2014 at Westside, overall these seven categories of common diagnosis codes were associated with an inpatient admission rate of 64.6 percent as compared to the national average of 21.1 percent and Florida average of 24.5 percent.

212. In 2015 at Westside, overall these seven categories of common diagnosis codes were associated with an inpatient admission rate of 63.4 percent as compared to the national average of 20.9 percent and Florida average of 24.7 percent.

213. By admitting these patients as inpatients, Westside obtained increased payments of approximately $9.1 million each year on average from the Medicare Program.

**Northwest's Overall Rates of Inpatient Admissions Escalated to Triple the National Average**

214. At Northwest Medical Center ("Northwest") in 2010, overall these seven categories of common diagnosis codes were associated with an inpatient admission rate of 45.9 percent as compared to the national average of 27.1 percent and Florida average of 31.1 percent.

215. Yet by 2014 at Northwest, overall these seven categories of common diagnosis codes were associated with an inpatient admission rate of 60.1 percent as compared to the national average of 21.1 percent and Florida average of 24.5 percent.

216. In 2015 at Northwest, these seven categories of common diagnosis codes were associated with in an inpatient admission rate of 61.8 percent as compared to the national average of 20.9 percent and Florida average of 24.7 percent.

217. Northwest's rates of Medicare inpatient admissions based on these diagnosis codes have increased to approximately triple the national average.

218. By admitting these patients as inpatients, Northwest obtained increased payments of approximately $8.1 million each year on average from the Medicare Program.

### JFK's Overall Rates of Inpatient Admissions Escalated to Nearly Triple the National Average

219. At JFK Medical Center, the pressure to push patients into inpatient status has been present and revealed in the Medicare inpatient percentages dating back to at least 2010.

220. At JFK Medical Center in 2010, overall these seven categories of common diagnosis codes were associated with an inpatient admission rate of 49.5 percent as compared to the national average of 27.1 percent and Florida average of 31.1 percent. In the following year (2011), these seven categories of common diagnosis codes were associated with an inpatient admission rate of 60.5 percent as compared to the national average of 27.5 percent and Florida average of 31.0 percent.

221. In 2012, these seven categories of common diagnosis codes were associated with an inpatient admission rate of 59.5 percent as compared to the national average of 22.5 percent and Florida average of 24.8 percent. The Medicare inpatient percentages again approached the 60 percent benchmark, reflecting admission rates approximately triple the national average.

222. The Medicare inpatient rates continued at high levels in 2013 with inpatient admissions based on these common diagnoses codes at 55.0 percent compared to the national average of 22.2 percent and Florida average of 24.7 percent.

223. In 2014, these seven categories of common diagnosis codes were associated with an inpatient admission rate of 53.8 percent as compared to the national average of 21.1 percent and Florida average of 24.5 percent. In 2015, overall these seven categories of common diagnosis codes were associated with an inpatient admission rate of 54.4 percent as compared to the national average of 20.9 percent and Florida average of 24.7 percent.

224. By admitting these Medicare patients as inpatients, JFK Medical Center obtained increased payments of approximately $24.4 million each year on average from the Medicare Program.

**Lawnwood's Overall Rates of Inpatient Admissions Escalated to Triple the National Average**

225. At Lawnwood Medical Center ("Lawnwood") in 2013, overall these seven categories of common diagnosis codes were associated with an inpatient admission rate of 62.2 percent as compared to the

national average of 22.2 percent and Florida average of 24.7 percent.

226.    In 2014, these seven categories of common diagnosis codes were associated with an inpatient admission rate of 64.2 percent as compared to the national average of 21.1 percent and Florida average of 24.5 percent.

227.    In 2015 at Lawnwood, these seven categories of common diagnosis codes were associated with an inpatient admission rate of 62.7 percent as compared to the national average of 20.9 percent and Florida average of 24.7 percent. Lawnwood's rates of Medicare inpatient admissions based on these diagnosis codes have also been approximately triple the national average.

228.    By admitting these Medicare patients as inpatients, Lawnwood obtained increased payments of approximately $16.0 million each year on average from the Medicare Program.

**Plantation's Overall Rates of Inpatient Admissions Escalated to More Than Double the National Average**

229.    At Plantation General in 2011, overall these seven categories of common diagnosis codes were associated with an inpatient admission rate of 26.2 percent that was consistent with the national

average of 27.5 percent and Florida average of 31.0 percent. Yet by 2014 at Plantation General, overall these seven categories of common diagnosis codes were associated with an inpatient admission rate of 48.6 percent ---over double the national average of 21.1 percent and approximately double the Florida average of 24.5 percent.

230.    In 2015 at Plantation, overall these seven categories of common diagnosis codes were associated with an inpatient admission rate of 46.5 percent----again over double national average of 20.9 percent and nearly double the Florida average of 24.7 percent.

231.    By admitting these Medicare patients as inpatients, Plantation General obtained increased payments of approximately $7.15 million each year on average from the Medicare Program.

## University's Overall Rates of Inpatient Admissions Escalated to Nearly Triple the National Average

232.    At University Hospital and Medical Center ("University") in 2010, overall these seven categories of common diagnosis codes were associated with an inpatient admission rate of 39.6 percent as compared to the national average of 27.1 percent and Florida average of 31.0 percent.  Yet by 2012 at University, overall these

seven categories of common diagnosis codes were associated with an inpatient admission rate of 51.1 percent ---over double the national average of 22.5 percent and Florida average of 24.8 percent.

233.    In 2015, overall these seven categories of common diagnosis codes were associated with an inpatient admission rate of 57.9 percent ----nearly triple the national average of 20.9 percent and over double the Florida average of 24.7 percent.

234.    By admitting these Medicare patients as inpatients, University obtained increased payments of approximately $4.66 million each year on average from the Medicare Program.

**Raulerson's Overall Rates of Inpatient Admissions Escalated to Approximately Double the National Average**

235.    At Raulerson Hospital in 2010, overall these seven categories of common diagnosis codes were associated with an inpatient admission rate of 34.0 percent ----relatively close to the national average of 27.1 percent and Florida average of 31.1 percent. Yet by 2012, 2013, 2014, and 2015, overall these seven categories of common diagnosis codes were associated with inpatient admission rates approximately double the national averages.

236.    In 2012 at Raulerson, overall these seven categories of common diagnosis codes were associated with an inpatient admission rate of 44.3 percent ---approximately double the national average of 22.5 percent and nearly double the Florida average of 24.8 percent.

237.    In 2013, overall these seven categories of common diagnosis codes were associated with an inpatient admission rate of 42.5 percent ----nearly double national average of 22.2 percent and Florida average of 24.7 percent.

238.    In 2014 at Raulerson, overall these seven categories of common diagnosis codes were associated with an inpatient admission rate of 41.3 percent as compared to the national average of 21.1 percent and Florida average of 24.5 percent.

239.    In 2015 at Raulerson, overall these seven categories of common diagnosis codes were associated with an inpatient admission rate of 42.0 percent as compared to the national average of 20.9 percent and Florida average of 24.7 percent.

240.    By admitting these Medicare patients as inpatients, Raulerson obtained increased payments of approximately $3.40 million each year on average from the Medicare Program.

## JFK North's Overall Rates of Inpatient Admissions Escalated to Over Double the National and Florida Averages

241.    At JFK Medical Center North Campus ("JFK North") in 2012, 2013, 2014, and 2015, overall these seven categories of common diagnosis codes were associated with inpatient admission rates approximately double the national averages.

242.    In 2012 at JFK North, overall these seven categories of common diagnosis codes were associated with an inpatient admission rate of 48.9 percent ---more than double the national average of 22.5 percent and approximately double the Florida average of 24.8 percent.

243.    In 2013 at JFK North, overall these seven categories of common diagnosis codes were associated with an inpatient admission rate of 45.6 percent ----again more than double the national average of 22.2 percent and nearly double the Florida average of 24.7 percent.

244.    In 2014 at JFK North, these seven categories of common diagnosis codes were associated with an inpatient admission rate of 50.8 percent as compared to the national average of 21.1 percent and Florida average of 24.5 percent.

245.    In 2015 at JFK North, these seven categories of common diagnosis codes were associated with an inpatient admission rate of 50.8 percent as compared to the national average of 20.9 percent and Florida average of 24.7 percent.

246.    By admitting these Medicare patients as inpatients, JFK North obtained increased payments of approximately $2.37 million each year on average from the Medicare Program.

247.    With respect to specific groups of diagnosis codes, further examples of excessive inpatient admission rates at HCA East Florida hospitals are provided below.

## HCA East Florida Hospitals Used Common Diagnoses of Fever, Weakness, and Fatigue to Move Patients into Inpatient Status

### Inpatient Admissions at JFK Associated with Fever, Weakness, and Fatigue Increased to Approximately 500 Percent Above National and Florida Averages

248.    Group One codes are the general codes of fever, weakness, and fatigue. Since 2011, Medicare inpatient admissions associated with these common clinical conditions at JFK Medical Center have escalated to levels 500 percent over the national averages.

249.    For example, in 2012 the national average of Medicare inpatient admissions associated with these codes was 10.8 percent and the Florida average was 8.7 percent. Yet at JFK Medical Center in 2012, 55.9 percent of Medicare patients with one of these diagnoses codes were admitted as inpatients. The trend continued in subsequent years.

250.    In 2013, the national average of Medicare inpatient admissions associated with these codes was 11.1 percent and the Florida average was 9.4 percent. Yet at JFK Medical Center in 2013, 50.1 percent of Medicare patients with one of these diagnoses codes were admitted as inpatients.

251.    In 2014 the national average of Medicare inpatient admissions associated with these codes was 11.0 percent and the Florida average was 10.1 percent. Yet at JFK Medical Center in 2014, 50.0 percent of Medicare patients with one of these diagnoses codes were admitted as inpatients.

252.    In 2015, the national average of Medicare inpatient admissions associated with these codes was 11.0 percent and the Florida average was 10.4 percent. Yet at JFK Medical Center in 2015, 35.6

percent of Medicare patients with one of these diagnoses codes were admitted as inpatients.

253.    From 2012 through 2015, the national average of Medicare inpatient admissions associated with these diagnoses codes stayed steady at approximately 11 percent and the Florida average stayed steady between 8-10 percent. Yet at JFK Medical Center, the Medicare inpatient admissions associated with one of these codes were at least 300 percent over national and Florida averages and escalated to approximately 500 percent over the national and Florida averages in 2012, 2013, and 2014.

**Inpatient Admissions at St. Lucie Associated with Fever, Weakness, and Fatigue Increased to Approximately 500 Percent Above National and Florida Averages**

254.    Group One codes are the general codes of fever, weakness, and fatigue. Since 2011, Medicare inpatient admissions associated with these common clinical conditions at St. Lucie Medical Center have escalated to levels 500 percent over the national and Florida averages.

255.    For example, in 2012 the national average of Medicare inpatient admissions associated with these codes was 10.8 percent and the Florida average was 8.7 percent. Yet at St. Lucie Medical

Center in 2012, 31.8 percent of Medicare patients with one of these diagnoses codes were admitted as inpatients.

256.    In 2013, the national average of Medicare inpatient admissions associated with these codes was 11.1 percent and the Florida average was 9.4 percent. Yet at St. Lucie Medical Center in 2013, 55.7 percent of Medicare patients with one of these diagnosis codes were admitted as inpatients.

257.    In 2014 the national average of Medicare inpatient admissions associated with these codes was 11.0 percent and the Florida average was 10.1 percent. Yet at St. Lucie Medical Center in 2014, 58.3 percent of Medicare patients with one of these diagnosis codes were admitted as inpatients.

258.    In 2015, the national average of Medicare inpatient admissions associated with these codes was 11.0 percent and the Florida average was 10.4 percent. Yet at St. Lucie Medical Center in 2015, 54.5 percent of Medicare patients with one of these diagnoses codes were admitted as inpatients.

259.    From 2012 through 2015, the national average of Medicare inpatient admissions associated with these diagnoses codes stayed steady at approximately 11 percent and the Florida average stayed

steady at 8-10 percent. Yet at St. Lucie Medical Center, Medicare inpatient admissions associated with one of these codes escalated to approximately 500 percent over the national and Florida averages in 2013, 2014, and 2015.

**Inpatient Admissions at Lawnwood Associated with Fever, Weakness, and Fatigue Increased to Approximately 500 Percent Above National and Florida Averages**

260.    Similar patterns are seen at Lawnwood Regional Medical Center ("Lawnwood").

261.    Group One codes are the general codes of fever, weakness, and fatigue. Since 2012, Medicare inpatient admissions associated with these common clinical conditions at Lawnwood Regional Medical Center have escalated to levels approximately 500 over the national and Florida averages.

262.    For example, in 2012 the national average of Medicare inpatient admissions associated with these codes was 10.8 percent and the Florida average was 8.7 percent. Yet at Lawnwood in 2012, 51.6 percent of Medicare patients with one of these diagnosis codes were admitted as inpatients. The trend continued in subsequent years.

263. In 2013, the national average of inpatient admissions associated with these codes was 11.1 percent and the Florida average was 9.4 percent. Yet at Lawnwood in 2013, 51.4 percent of Medicare patients with one of these diagnosis codes were admitted as inpatients.

264. In 2014 the national average of Medicare inpatient admissions associated with these codes was 11.0 percent and the Florida average was 10.1 percent. Yet at Lawnwood in 2014, 58.3 percent of Medicare patients with one of these diagnosis codes were admitted as inpatients.

265. In 2015, the national average of Medicare inpatient admissions associated with these codes was 11.0 percent and the Florida average was 10.4 percent. Yet at Lawnwood in 2015, 51.4 percent of Medicare patients with one of these diagnosis codes were admitted as inpatients.

266. From 2012 through 2015, the national average of Medicare inpatient admissions associated with these diagnoses codes stayed steady at approximately 11 percent and the Florida average stayed steady at 8-10 percent. Yet at Lawnwood, the Medicare inpatient admissions associated with one of these codes were at least 400

percent over national and Florida averages and escalated to approximately 500 percent over national and Florida averages.

**Inpatient Admissions at Northwest Associated with Fever, Weakness, and Fatigue Increased to Approximately 500 Percent Above National and Florida Averages**

267.    Similar patterns to move these patients into inpatient status are seen at Northwest Medical Center ("Northwest").

268.    Group One codes are the general codes of fever, weakness, and fatigue. Since 2012, Medicare inpatient admissions associated with these common clinical conditions at Northwest have escalated to levels approximately 500 over the national averages.

269.    For example, in 2012 the national average of Medicare inpatient admissions associated with these codes was 10.8 percent and the Florida average was 8.7 percent. Yet at Northwest in 2012, 32.5 percent of Medicare patients with one of these diagnoses codes were admitted as inpatients. The Medicare inpatient percentages increased in subsequent years.

270.    In 2013, the national average of Medicare inpatient admissions associated with these codes was 11.1 percent and the Florida average was 9.4 percent. Yet at Northwest in 2013, 37.8 percent of

Medicare patients with one of these diagnoses codes were admitted as inpatients.

271.    In 2014 the national average of Medicare inpatient admissions associated with these codes was 11.0 percent and the Florida average was 10.1 percent. Yet at Northwest in 2014, 49.2 percent of Medicare patients with one of these diagnoses codes were admitted as inpatients.

272.    In 2015, the national average of Medicare inpatient admissions associated with these codes was 11.0 percent and the Florida average was 10.4 percent. Yet at Northwest in 2015, 55.0 percent of Medicare patients with one of these diagnoses codes were admitted as inpatients.

273.    From 2012 through 2015, the national average of Medicare inpatient admissions associated with these diagnoses codes stayed steady at approximately 11 percent and the Florida average stayed steady at 8-10 percent. Yet at Northwest, the Medicare inpatient admissions associated with one of these codes escalated to approximately 500 percent over national and Florida averages.

## Inpatient Admissions at Palms West Associated with Fever, Weakness, and Fatigue Increased to Nearly 600 Percent Above National and Florida Averages

274.    Similar patterns to increasingly move Medicare patients with these diagnosis codes into inpatient status are seen at Palms West Hospital ("Palms West").

275.    Group One codes are the general codes of fever, weakness, and fatigue. Since 2012, Medicare inpatient admissions associated with these common clinical conditions at Palms West have escalated to levels nearly 600 percent over the national and Florida averages.

276.    For example, in 2012 the national average of Medicare inpatient admissions associated with these codes was 10.8 percent and the Florida average was 8.7 percent. Yet at Palms West in 2012, 41.0 percent of Medicare patients with one of these diagnoses codes were admitted as inpatients. The inpatient percentages increased in subsequent years.

277.    In 2013, the national average of Medicare inpatient admissions associated with these codes was 11.1 percent and the Florida average was 9.4 percent. Yet at Palms West in 2013, 61.1 percent of Medicare patients with one of these diagnoses codes were admitted as inpatients.

278.    In 2014 the national average of Medicare inpatient admissions associated with these codes was 11.0 percent and the Florida average was 10.1 percent. Yet at Palms West in 2014, 63.0 percent of Medicare patients with one of these diagnoses codes were admitted as inpatients.

279.    In 2015, the national average of Medicare inpatient admissions associated with these codes was 11.0 percent and the Florida average was 10.4 percent. Yet at Palms West in 2015, 65.2 percent of Medicare patients with one of these diagnoses codes were admitted as inpatients.

280.    From 2012 through 2015, the national average of Medicare inpatient admissions associated with these diagnoses codes stayed steady at approximately 11 percent and the Florida average stayed steady at 8-10 percent. Yet at Palms West, Medicare inpatient admissions associated with one of these codes escalated to nearly 600 percent over national averages.

**Inpatient Admissions at Kendall Associated with Fever, Weakness, and Fatigue Increased to Nearly 300 Percent Above National Averages**

281. Similar patterns to increasingly move Medicare patients with these diagnosis codes into inpatient status are seen at Kendall Regional Medical Center ("Kendall").

282. Group One codes are the general codes of fever, weakness, and fatigue. In 2010, Medicare inpatient admissions associated with these common clinical conditions at Kendall were only 6.8 percent---less than the national average of 14.7 percent and the Florida average of 13.8 percent.

283. Yet by 2014 and 2015, Medicare inpatient admissions associated with these common clinical admissions at Kendall moved to nearly 300 percent above the national and Florida averages.

284. For example, in 2012 the national average of Medicare inpatient admissions associated with these codes was 10.8 percent and the Florida average was 8.7 percent. Yet at Kendall in 2012, 23.9 percent of Medicare patients with one of these diagnoses codes were admitted as inpatients. The inpatient percentages increased in subsequent years.

285. In 2013, the national average of Medicare inpatient admissions associated with these codes was 11.1 percent and the Florida

average was 9.4 percent. Yet at Kendall in 2013, 25.5 percent of Medicare patients with one of these diagnoses codes were admitted as inpatients.

286. In 2014 the national average of Medicare inpatient admissions associated with these codes was 11.0 percent and the Florida average was 10.1 percent. Yet at Kendall in 2014, 30.2 percent of Medicare patients with one of these diagnoses codes were admitted as inpatients.

287. In 2015, the national average of Medicare inpatient admissions associated with these codes was 11.0 percent and the Florida average was 10.4 percent. Yet at Kendall in 2015, 30.3 percent of Medicare patients with one of these diagnoses codes were admitted as inpatients.

288. From 2012 through 2015, the national average of Medicare inpatient admissions associated with these diagnoses codes stayed steady at approximately 11 percent and the Florida average stayed steady at 8-10 percent. Yet at Kendall from 2011, the Medicare inpatient admissions associated with one of these codes moved from below national averages to nearly 300 percent over national and Florida averages.

**Inpatient Admissions at Plantation Associated with Fever, Weakness, and Fatigue Increased to Approximately 250 Percent Above National Averages**

289.    Similar patterns to increasingly move Medicare patients with these diagnosis codes into inpatient status are seen at Plantation General Hospital ("Plantation").

290.    Group One codes are the general codes of fever, weakness, and fatigue. In 2011, Medicare inpatient admissions associated with these common clinical conditions at Plantation were only 9.0 percent---less than the national average of 19.1 percent and Florida average of 17.3 percent.

291.    Yet by 2013 and 2014, Medicare inpatient admissions associated with these common diagnosis codes at Plantation moved to approximately 250 percent above national and Florida averages.

292.    For example, in 2013, the national average of Medicare inpatient admissions associated with these codes was 11.1 percent and the Florida average was 9.4 percent. Yet at Plantation in 2013, 27.9 percent of Medicare patients with one of these diagnoses codes were admitted as inpatients.

293.    In 2014 the national average of Medicare inpatient admissions associated with these codes was 11.0 percent and the Florida

average was 10.1 percent. Yet at Plantation in 2014, 27.3 percent of Medicare patients with one of these diagnoses codes were admitted as inpatients.

294.    In 2015, the national average of Medicare inpatient admissions associated with these codes was 11.0 percent and the Florida average was 10.4 percent. Yet at Plantation in 2015, 23.6 percent of Medicare patients with one of these diagnoses codes were admitted as inpatients.

295.    The Medicare inpatient admissions associated with these codes moved from below national averages at Plantation in 2011 to approximately 250 percent over national and Florida averages in 2013 and 2014 and 210 percent over national and Florida averages in 2015.

## HCA East Florida Hospitals Used Common Diagnoses of Muscle Spasm, Low Back Pain, Lumbar Strain, and Cervical Strain to Push Patients into Inpatient Status

### Palm West's Rates of Inpatient Admissions Associated with Muscle Spasm, Low Back Pain, Lumbar Strain, and Cervical Strain Have Increased to Levels 640 Percent Over the National Average

296.    Group Seven codes are the general codes of muscle spasm, low back pain, lumbar strain, and cervical strain. Since 2011, Medicare

99

inpatient admissions associated with these common clinical conditions at Palm West Hospital have escalated to levels 400-600 percent above national and Florida averages.

297.    For example, in 2012 the national average of Medicare inpatient admissions associated with these diagnosis codes was 9 percent and the Florida average was 9.9. Yet at Palms West Hospital in 2012, 28.8 percent of Medicare patients with one of these diagnosis codes were admitted as inpatients. The trend worsened in subsequent years.

298.    In 2013, the national average of Medicare inpatient admissions associated with these codes was 8.7 percent and the Florida average was 9.5 percent. Yet at Palms West Hospital in 2013, 32.4 percent of Medicare patients with one of these diagnosis codes were admitted as inpatients.

299.    In 2014 the national average of Medicare inpatient admissions associated with these codes was 8.4 percent and the Florida average was 9.5 percent. Yet at Palms West Hospital in 2014, 54.5 percent of Medicare patients with one of these diagnosis codes were admitted as inpatients. The Medicare inpatient admissions rate

associated with one of these diagnosis codes was approximately 640 percent above the national and Florida averages.

300.  In 2015, the national average of Medicare inpatient admissions associated with these codes was 8.6 percent and the Florida average was 10.0 percent. Yet at Palms West Hospital in 2015, 33.3 percent of Medicare patients with one of these diagnoses codes were admitted as inpatients. The Medicare inpatient admission rate based on one of these diagnosis codes remained at nearly 400 percent above the national average and over 300 percent above the Florida average.

301.  From 2012 through 2015, the national average of Medicare inpatient admissions associated with these diagnosis codes stayed steady at approximately 9 percent and the Florida average stayed steady at 9-10 percent. Yet at Palms West Hospital, the Medicare inpatient admission rates associated with one of these codes were 400-600 percent over national and Florida averages.

**JFK's Rates of Inpatient Admissions Associated with Muscle Spasm, Low Back Pain, Lumbar Strain, and Cervical Strain Have Increased to Levels 300-400 Percent Over National Averages**

302.  Group Seven codes are the general codes of muscle spasm, low back pain, lumbar strain, and cervical strain. Since 2011, Medicare

inpatient admissions associated with these common diagnosis codes at JFK Medical Center have escalated to levels approximately 500 percent over the national and Florida averages.

303.    For example, in 2012 the national average of Medicare inpatient admissions associated with these common symptoms was 9 percent and the Florida average was 9.9 percent. Yet at JFK Medical Center in 2012, 35.3 percent of Medicare patients with one of these diagnosis codes were admitted as inpatients. In 2013, the national average of Medicare inpatient admissions associated with these codes was 8.7 percent and the Florida average was 9.5 percent. Yet at JFK Medical Center in 2013, 29.4 percent of Medicare patients with one of these diagnosis codes were admitted as inpatients.

304.    In 2014 the national average of Medicare inpatient admissions associated with these codes was 8.4 percent and the Florida average was 9.5 percent. Yet at JFK Medical Center in 2014, 29.0 percent of Medicare patients with one of these diagnosis codes were admitted as inpatients.

305.    In 2015, the national average of Medicare inpatient admissions associated with these codes was 8.6 percent and the Florida average

was 10.0 percent. Yet at JFK Medical Center in 2015, 25.3 percent of Medicare patients with one of these diagnosis codes were admitted as inpatients.

306.    From 2012 through 2015, the national average of Medicare inpatient admissions associated with these diagnosis codes stayed steady at approximately 9 percent and the Florida average stayed steady at 9-10 percent. Yet at JFK Medical Center, the Medicare inpatient admissions associated with one of these codes were 300-400 percent over national and Florida averages.

### St. Lucie's Rates of Inpatient Admissions Associated with Muscle Spasm, Low Back Pain, Lumbar Strain, and Cervical Strain Have Increased to Levels 300-400 Percent Over National Averages

307.    Group Seven codes are the general codes of muscle spasm, low back pain, lumbar strain, and cervical strain. Since 2011, Medicare inpatient admissions associated with these common clinical conditions at St. Lucie's Medical Center have escalated to levels approximately 500 percent over the national and Florida averages.

308.    In 2010 at St. Lucie's Medical Center, 19.0 percent of Medicare patients with one of these diagnosis codes were admitted as inpatients.  That percent surged in subsequent years.

309. For example, in 2012 the national average of Medicare inpatient admissions associated with these common symptoms was 9 percent and the Florida average was 9.9 percent. Yet at St. Lucie's Medical Center in 2012, 34.5 percent of Medicare patients with one of these diagnoses codes were admitted as inpatients. In 2013, the national average of Medicare inpatient admissions associated with these codes was 8.7 percent and the Florida average was 9.5 percent. Yet at St. Lucie's Medical Center in 2013, 36.9 percent of Medicare patients with one of these diagnosis codes were admitted as inpatients.

310. In 2014 the national average of Medicare inpatient admissions associated with these codes was 8.4 percent and the Florida average was 9.5 percent. Yet at St. Lucie's Medical Center in 2014, 36.7 percent of Medicare patients with one of these diagnosis codes were admitted as inpatients.

311. In 2015, the national average of Medicare inpatient admissions associated with these codes was 8.6 percent and the Florida average was 10.0 percent. Yet at St. Lucie's Medical Center in 2015, 31.4 percent of Medicare patients with one of these diagnosis codes were admitted as inpatients.

312.   From 2012 through 2015, the national average of Medicare inpatient admissions associated with these diagnosis codes stayed steady at approximately 9 percent and the Florida average stayed steady at 9-10 percent. Yet at St. Lucie's Medical Center, the Medicare inpatient admissions associated with one of these codes were 300-400 percent over national averages.

## HCA East Florida Hospitals Used Common Conditions of Cough, Dyspnea, and Asthma to Move Patients into Inpatient Status

313.   Group Four codes are the common conditions of cough, dyspnea (shortness of breath), and asthma. These conditions are common in the Medicare population and usually treated on an outpatient basis.

314.   Since 2010, Medicare inpatient admissions associated with these common clinical conditions at numerous HCA East Florida hospitals have escalated to levels approximately 800-1100 percent over national and Florida averages.

315.   Nationally between 2010 and 2015, inpatient admissions associated with these common diagnosis codes have stayed steady at approximately 4 percent. The same was true at non-HCA hospitals in Florida. But not at HCA East Florida hospitals where

Medicare inpatient admissions associated with these common codes have risen sharply.

316.    The following discussion provides examples of escalating inpatient admissions based on these diagnosis codes at HCA East Florida hospitals between 2010 and 2015.

317.    For example, in 2010 the national average of Medicare inpatient admissions associated with these common symptoms was 3.2 percent and the Florida average was 3.4 percent. In 2010, the percentages of Medicare inpatient admissions associated with these codes were close to the national average and Florida average at Aventura Hospital, Kendall Regional Medical Center, and Northwest Medical Center. Yet in subsequent years, Medicare inpatient admissions associated with these codes escalated to 800-1100 percent over national and Florida averages.

318.    As discussed above, Aventura's rates of Medicare inpatient admissions associated with cough, dyspnea, and asthma increased by 747 percent between 2010 and 2015. At Aventura, Medicare inpatient admissions associated with one of these codes increased to approximately 1000 percent over national and Florida averages in

2014 and approximately 1100 percent over national and Florida averages in 2015.

319.    As discussed below, similar escalations in Medicare inpatient admissions associated with these codes happened at other HCA East Florida hospitals between 2010 and 2015.

### Kendall's Rates of Inpatient Admissions Associated with Cough, Dyspnea, and Asthma Increased by 850 Percent

320.    At Kendall Regional, Medicare inpatient admissions associated with these codes moved from 4.8 percent in 2010 to 18.7 percent in 2011, 14.9 percent in 2011, 13.6 percent in 2012, 15.3 percent in 2014, and 40.9 percent in 2015.

321.    In 2015, the national average of Medicare inpatient admissions associated with these codes was 3.9 percent and the Florida average was 4.7 percent. Yet at Kendall Regional in 2015, 40.9 percent of Medicare patients with one of these diagnoses codes were admitted as inpatients.

322.    At Kendall Regional, Medicare inpatient admissions associated with these codes moved from 4.8 percent in 2010 to 40.9 percent in in 2015. This increase represents an 850 percent increase between

2010 and 2015 for Medicare inpatient admission rates associated with these codes at this hospital.

### Northwest's Rates of Inpatient Admissions Associated with Cough, Dyspnea, and Asthma Increased by 640 Percent

323. A similar escalation with Medicare inpatient admissions associated with these codes took place at Northwest Medical Center.

324. At Northwest, Medicare inpatient admissions associated with these codes moved from 5.4 percent in 2010 to 6.9 percent in 2011, 11.6 percent in 2012, 11.1 percent in 2012, 24.6 percent in 2014, and 34.8 percent in 2015.

325. In 2014 the national average of Medicare inpatient admissions associated with these codes was 4.0 percent and the Florida average was 4.7 percent. Yet at Northwest Medical Center in 2014, 24.6 percent of Medicare patients with one of these diagnoses codes were admitted as inpatients. That percentage jumped drastically in the following year.

326. In 2015, the national average of Medicare inpatient admissions associated with these codes was 3.9 percent and the Florida average was 4.7 percent. Yet at Northwest in 2015, 34.8 percent of

Medicare patients with one of these diagnoses codes were admitted as inpatients. This increase represents a nearly 640 percent jump comparing 2010 and 2015 for Medicare inpatient admission rates associated with these codes at this hospital.

## HCA's Scheme Extends Beyond These Seven Categories of Diagnosis Codes

327.    Based on his experience working under HCA's administration, Dr. Ruiz identified other diagnosis codes commonly used by HCA's executives to push patients into inpatient status. These codes were then evaluated in 2014 Medicare claims data submitted by Aventura Hospital, all hospitals within HCA East Florida, and all HCA hospitals nationally. The inpatient rates of admission were then compared to national average rates of admissions for all acute care hospitals in the United States in 2014.[5]

328.    With respect to each additional group of diagnoses codes at Aventura Hospital, HCA East Florida Division hospitals, and HCA hospitals nationally, inpatient admission rates were dramatically higher than national average rates. The scheme at Aventura, HCA

---

[5] The data evaluated was the Medicare claims data submitted by 3,144 short-term acute care hospitals in the United States in 2014.

East Florida, and HCA nationally is far-reaching and has caused massive damages to the Medicare Program.

329. The results evidence HCA's scheme to increase inpatient admissions associated with common diagnosis codes among Medicare patients usually treated on an outpatient basis by the vast majority of hospitals in the United States other than HCA hospitals.

330. The second set of codes includes the following:

| Nephrology | ICD 9 | ICD 10 |
|---|---|---|
| Electrolyte imbalance | 276.9 | E87.8 |
| Hypokalemia | 276.8 | E87.6 |
| Hyponatremia | 276.1 | E87.1 |
| Hypernatremia | 276.0 | E87.0 |
| Dehydration | 276.51 | E86.0 |
| | | |
| **Pulmonary** | | |
| Bronchiectasis | 494.1 | J47.1 |
| COPD | 496 | J44.9 |
| Dyspnea | 786.09 | R06.00 |
| Wheezing | 786.07 | R06.2 |
| | | |
| **HEMATOLOGY** | | |
| Unspec. Def . Anemia | 281.9 | D53.9 |
| Iron Def. Anemia | 280.9 | D50.9 |
| Leukocytosis | 288.60 | D72.829 |
| Thrombocytopenia | 287.5 | D69.6 |
| DVT | 453.40 | I82.409 |
| Pulmonary embolism | 415.19 | I26.99 |
| Sickle cell crisis | 282.69 | D57.819 |
| | | |
| **Gastroenterology** | | |
| Generalized abdominal pain | 789.07 | R10.84 |
| Epigastric abd pain | 789.06 | R10.13 |

| | | |
|---|---|---|
| Dysphagia | 787.22 | R13.12 |
| Gastritis | 535.00 | K29.00 |
| Gastric ulcer | 531.90 | K25.9 |
| Colitis | 558.9 | K52.9 |
| GERD | 530.81 | K21.9 |

**Cardiovascular**

| | | |
|---|---|---|
| Hypertension | 401.9 | I10 |
| Hypertension crisis | 401.0 | I16.9 |
| Edema | 782.3 | R60.9 |
| Hypotension | 458.9 | I95.9 |

**Urology/Renal**

| | | |
|---|---|---|
| Pyelonephritis | 590.81 | N16 |
| UTI | 599.0 | N39.0 |
| Cystitis | 595.5 | N30.90 |
| Pelvic pain | 625.9 | R10.2 |
| Urinary retention | 788.20 | R33.9 |

**Neurology/Psych**

| | | |
|---|---|---|
| Altered mental status | 780.97 | R41.82 |
| Concussion | 850.0 | S06.0X0A |
| Delirium | 293.0 | F05 |
| Panic attack | 300.01 | F41.0 |
| Anxiety | 300.00 | F41.9 |
| Cocaine abuse | 305.60 | F14.10 |
| Alcohol withdrawal | 291.81 | F10.239 |
| Other chronic Pain | 338.29 | G89.29 |

**Endocrinology**

| | | |
|---|---|---|
| Hypothyroidism | 244.9 | E03.9 |
| Hyperglycemia | 790.29 | R73.09 |
| Diabetes mellitus 2 | 250.00 | E11.9 |
| Allergic reaction | 995.3 | T78.40XA |
| Retropharyngeal Abscess | 478.24 | J39.0 |
| Cellulitis of face | 682.0 | L03.211 |

## Aventura's Inpatient Admissions Associated with Cardiovascular Codes of Hypertension, Edema, and Hypotension Were Nearly Triple the National Average

331.   For example, Dr. Ruiz identified the common cardiovascular diagnosis codes of hypertension (ICD 9 code 401.9), hypertension crisis (ICD 9 code 401.0), edema (ICD 9 code 782.3), and hypotension (ICD 9 code 458.9).  In 2014 among all acute care hospitals treating Medicare patients in the United States, these cardiovascular conditions were treated on an outpatient basis 73.5 percent of the time and treated on an inpatient basis in only 26.5 percent of cases. Yet the opposite picture emerges from evaluation of Medicare claims at Aventura and HCA East Florida hospitals.

332.   At Aventura Hospital in 2014, Medicare patients with these diagnosis codes were admitted as inpatients in 76.7 percent of cases--- opposite the national norm of treating these patients on an outpatient basis in 73.5 percent of cases.

333.   At HCA East Florida hospitals overall in 2014, Medicare patients with these diagnosis codes were admitted as inpatients in 67.9 percent of cases---opposite the national norm of treating these patients on an outpatient basis in 73.5 percent of cases.

334.    By shifting these patients into inpatient status as compared to national norms, Aventura Hospital gained Medicare payments in the approximate amount of $39.5 million for 2014 alone and HCA East Florida hospitals gained approximately $235 million in Medicare payments for 2014 alone.

**Aventura's and HCA East Florida's Inpatient Admissions Associated with Endocrinology Codes Were Approximately Triple the National Average**

335.    Another example is endocrinology codes. Dr. Ruiz identified the endocrinology codes of hypothyroidism (ICD 9 code 244.9), hyperglycemia (ICD 9 code 790.29), diabetes mellitus 2 (ICD 9 code 250.00), allergic reaction (ICD 9 code 995.3), retropharyngeal abscess (ICD 9 code 478.24), and cellulitis of face (ICD 9 code 682.0).

336.    In 2014 at all acute care hospitals treating Medicare patients in the United States, these endocrinology conditions were treated on an outpatient basis 74.6 percent of the time and admitted as inpatients in 25.4 percent of cases.   Yet the opposite picture emerges from evaluation of claims at Aventura and HCA East Florida hospitals.

337.    At Aventura Hospital in 2014, Medicare patients with these diagnosis codes were admitted as inpatients in 81.8 percent of cases---over three times higher than the national average of 25.4 percent.

338.    At HCA East Florida hospitals overall in 2014, Medicare patients with these diagnosis codes were admitted as inpatients in 74.7 percent of cases---opposite the national norm of treating these patients on an outpatient basis in 74.6 percent of cases. At HCA East Florida hospitals overall, the inpatient admission rate of 74.7 percent associated with these endocrinology codes was approximately three times higher than the national average of 25.4 percent.

339.    By shifting these patients into inpatient status as compared to national norms, Aventura Hospital gained increased Medicare payments in the approximate amount of $27 million for 2014 alone and HCA East Florida hospitals gained approximately $179 million in higher Medicare payments for 2014 alone.

**Aventura's and HCA East Florida's Inpatient Admissions Associated with Hematology Codes Were Over Double the National Average**

340.    Another example is hematology codes. Dr. Ruiz identified the hematology codes of unspecified anemia (ICD 9 code 281.9), iron deficiency anemia (ICD 9 code 280.9), leukocytosis (ICD 9 code 288.60), thrombocytopenia (ICD 9 code 287.5), deep vein thrombosis    (ICD 9 code 453.40), pulmonary embolism (ICD 9 code 415.19), and sickle cell crisis (ICD 9 Code 282.69).

341.    In 2014 at all acute care hospitals treating Medicare patients in the United States, these endocrinology conditions were treated on an inpatient basis in 39.1 percent of cases.

342.    Yet at Aventura Hospital in 2014, Medicare patients with these diagnosis codes were admitted as inpatients in 89.3 percent of cases--- more than double the national average of inpatient admissions (39.1 percent).

343.    At HCA East Florida hospitals overall in 2014, Medicare patients with these diagnosis codes were admitted as inpatients in 86.9 percent of cases---again more than double the national average of inpatient admissions (39.1 percent).

344.    By shifting these patients into inpatient status as compared to national norms, Aventura Hospital gained increased Medicare payments in the approximate amount of $8.5 million for 2014 alone

115

and HCA East Florida hospitals gained approximately $64.4 million in higher Medicare payments for 2014 alone.

## Aventura's and HCA East Florida's Inpatient Admissions Associated with Neurology Codes Were Nearly Double the National Average

345.    Another example is neurology codes. Dr. Ruiz identified the neurology codes of altered mental status (ICD 9 code 780.97), concussion (ICD 9 code 850.0), delirium (ICD 9 code 293.0), panic attack (ICD 9 code 300.01), anxiety (ICD 9 code 300.00), cocaine abuse (ICD 9 code 305.60), and alcohol withdrawal (ICD 9 Code 291.81).

346.    In 2014 at all acute care hospitals treating Medicare patients in the United States, the average inpatient admission rate associated with these codes was 44 percent.

347.    Yet at Aventura Hospital in 2014, the Medicare inpatient admission rate associated with these diagnosis codes was 78.3 percent.

348.    At HCA East Florida hospitals overall in 2014, Medicare patients with these diagnosis codes were admitted as inpatients in 79 percent of cases---far higher than the national average of 44 percent for inpatient admissions.

116

349. By shifting these patients into inpatient status as compared to national norms, Aventura Hospital gained increased Medicare payments in the approximate amount of $5.4 million for 2014 alone and HCA East Florida hospitals gained approximately $51.1 million in higher Medicare payments for 2014 alone.

**Aventura's and HCA East Florida's Inpatient Admissions Associated with Gastroenterology Codes Were Nearly Double the National Average**

350. A further example is gastroenterology codes. Dr. Ruiz identified the gastroenterology codes of generalized abdominal pain (ICD 9 code 789.07), epigastric abdominal pain (ICD 9 code 789.06), dysphagia or difficulty swallowing (ICD 9 787.22), gastritris (ICD 9 code 535.00), gastric ulcer (ICD 9 code 531.90), colitis (ICD 9 code 558.9), and GERD (gastroesophageal reflux disease) (ICD 9 Code 530.81).

351. In 2014 at all acute care hospitals treating Medicare patients in the United States, the average inpatient admission rate associated with these codes was 43.5 percent.

352. Yet at Aventura Hospital in 2014, the Medicare inpatient admission rate associated with these diagnosis codes was 84.6 percent---nearly double the national average of 43.5 percent.

117

353. At HCA East Florida hospitals overall in 2014, Medicare patients with these diagnosis codes were admitted as inpatients in 81.3 percent of cases---nearly double the national average of 43.5 percent.

354. By shifting these patients into inpatient status as compared to national norms, Aventura Hospital gained increased Medicare payments in the approximate amount of $9.5 million for 2014 alone and HCA East Florida hospitals gained approximately $66.2 million in higher Medicare payments for 2014 alone.

**Aventura's and HCA East Florida's Inpatient Admissions Associated with Pulmonary Codes Were Over Double the National Average**

355. A further example is additional pulmonary codes. Dr. Ruiz identified the pulmonary codes of bronchiectasis (ICD 9 code 494.01), COPD (ICD 9 code 496), dyspnea or shortness of breath (ICD 9 786.09), and wheezing (ICD 9 Code 786.07).

356. In 2014 at all hospitals treating Medicare patients in the United States, the average inpatient admission rate associated with these codes was 31.6 percent.

357. Yet at Aventura Hospital in 2014, the Medicare inpatient admission rate associated with these diagnosis codes was 81.7 percent---over double the national average of 31.6 percent.

358. At HCA East Florida hospitals overall in 2014, Medicare patients with these diagnosis codes were admitted as inpatients in 73.6 percent of cases---over double the national average of 31.6 percent.

359. By shifting these patients into inpatient status as compared to national norms, Aventura Hospital gained increased Medicare payments in the approximate amount of $8.7 million for 2014 alone and HCA East Florida hospitals gained approximately $51.2 million in higher Medicare payments for 2014 alone.

**Aventura's and HCA East Florida's Inpatient Admissions Associated with Urology Codes Were Over Double the National Average**

360. A further example is urology codes. Dr. Ruiz identified the urology codes of pyelonephritis or kidney infection (ICD 9 code 590.81), urinary tract infection (ICD 9 code 599.0), cystitis or inflammation of the bladder (ICD 9 595.5), pelvic pain (ICD 9 code 625.9), and urinary retention (ICD 9 code 788.20).

361.    In 2014 at all acute care hospitals treating Medicare patients in the United States, the average inpatient admission rate associated with these codes was 38.9 percent.

362.    Yet at Aventura Hospital in 2014, the Medicare inpatient admission rate associated with these diagnosis codes was 86 percent---over double the national average of 38.9 percent.

363.    At HCA East Florida hospitals overall in 2014, Medicare patients with these diagnosis codes were admitted as inpatients in 79.1 percent of cases---over double the national average of 38.9 percent.

364.    By shifting these patients into inpatient status as compared to national norms, Aventura Hospital gained increased Medicare payments in the approximate amount of $10.1 million for 2014 alone and HCA East Florida hospitals gained approximately $57.3 million in higher Medicare payments for 2014 alone.

**Escalating Inpatient Admissions at HCA East Florida Hospitals Have Caused Massive Damages to the Medicare Program**

365.    Overall with respect to the original seven groups of diagnosis codes, HCA East Florida hospitals have increased their inpatient

claims to the Medicare Program to levels that are double or triple the national average of inpatient admissions for these same codes.

366.   This escalation of increased inpatient admissions for common diagnoses is extraordinary and extreme compared to every other hospital system in the United States.

367.   Average annual damages to the Medicare Program from this escalation in inpatient admissions associated with the original seven groups of diagnosis codes at HCA East Florida Hospitals exceed $120 million per year. Over the last five years, damages to the Medicare Program from the escalation in inpatient admissions associated with these seven categories of common diagnoses codes at HCA East Florida hospitals exceed $600 million.

368.   As discussed above, further analyses of other diagnosis codes confirm that the escalation in inpatient admissions extends beyond these seven categories of codes. In the last five years, the scheme within HCA East Florida hospitals has caused estimated damages to the Medicare Program in excess of $1 billion.

**HCA's Inpatient Scheme is National Problem That Has Cost The Medicare Program In Excess of $5 Billion in the Last Five Years**

369. HCA's scheme to boost inpatient admissions is not limited to HCA East Florida. HCA owns and operates approximately 172 hospitals under common executive leadership. Extensive analyses of HCA's inpatient claims based on the original seven categories of diagnosis codes reveal HCA's national scheme to boost revenues by pushing patients into inpatient admissions instead of observation status.

370. In evaluating the Medicare claims of all acute care hospitals in the United States between 2010-2015, Medicare inpatient admissions associated with these diagnosis codes have declined from 27.1 percent in 2010 to 21.1 percent in 2014 and 20.9 percent in 2015.

371. Yet the trend is the opposite for HCA's hospital system. For all HCA hospitals in the last five years, overall Medicare inpatient admissions associated with these diagnosis codes have increased to levels that are approximately double the national average.

372. In 2013 at HCA hospitals nationally, the inpatient admission rate associated with these diagnosis codes was 41.4 percent---nearly double the national average of 22.2 percent.

373. In 2014 at HCA hospitals nationally, the inpatient admission rate associated with these diagnosis codes was 41.6 percent---- approximately double the national average of 21.1 percent. In 2015, that inpatient admission rate was 42.3 percent----again double the national average of 20.9 percent.

374. By admitting these Medicare patients as inpatients, the HCA hospital system obtained increased payments of approximately $941 million each year on average from the Medicare Program with respect to the original seven categories of diagnosis codes. The actual damages to the Medicare Program are higher because HCA's scheme extends beyond these seven categories of diagnosis codes as discussed above.

**The Leading 27 HCA Hospitals With Extraordinary 7-Year Inpatient Admission Rates More than Double National Averages**

375. A substantial percentage of these damages to the Medicare Program have been caused by 27 HCA hospitals with extraordinary inpatient admission rates associated with diagnosis codes usually treated on an outpatient basis in the United States. These 27 hospitals are as follows:

Aventura Hospital and Medical Center
Blake Medical Center

Brandon Regional Hospital
Central Florida Regional Hospital
Fawcett Memorial Hospital
JFK Medical Center
Kendall Regional Medical Center
Largo Medical Center
Lawnwood Regional Medical Center & Heart Institute
Medical Center Fort Worth
Medical Center of Trinity
Memorial Hospital
Methodist Stone Oak Hospital
Mountainview Hospital
Northside Hospital & Tampa Bay Heart Institute
Northwest Medical Center
Oak Hill Hospital
Ocala Regional Medical Center
Osceola Regional Medical Center
Palms West Hospital
Regional Medical Center Bayonet Point
Rio Grande Regional Hospital
Saint Lucie Medical Center
Saint Petersburg General Hospital
Southern Hills Hospital & Medical Center
Sunrise Hospital & Medical Center
Westside Regional Medical Center

376.     Six of these top 27 HCA hospitals are located in the HCA East

Florida Division. The second highest hospital in terms of damages

to the Medicare Program is JFK Medical Center located in the HCA

East Florida Division with estimated damages from excessive

inpatient admissions in the amount of approximately $24.4 million

per year.

Case 3:17-cv-01280    Document 1    Filed 09/19/17    Page 124 of 149 PageID #: 124

377.   All of these hospitals had 7-year average inpatient admission rates associated with the seven original categories of codes in excess of 50 percent--- more than double the 7-year national average of 24 percent.

378.   The 27 hospitals are led by Palms West Hospital in the East Florida Division with a 7-year overall inpatient admission rate of 64.8 percent as compared to the national average of 24 percent. Aventura Hospital in the East Florida Division has the seventh highest 7-year inpatient admission rate at 59.4 percent.

379.   Annual damages caused by excessive inpatient admissions at these 27 hospitals range from $25.2 million at Sunrise Hospital & Medical Center to 4.2 million at Saint Petersburg General Hospital.

380.   Total estimated damages to the Medicare Program from excessive inpatient admissions at these 27 hospitals exceed $346,961,356 per year.

381.   Relator has provided the Department of Justice with detailed data concerning the inpatient and outpatient Medicare claims for each of these 27 hospitals. The data includes the following for each year from 2009-2015: inpatient Medicare cases for each group of diagnosis codes, outpatient Medicare cases for each group of

diagnosis codes, average inpatient and outpatient Medicare payments for each group of diagnosis codes and the payment differential, Medicare inpatient admission percentages and Medicare outpatient status for each group for diagnosis codes, the 7-year average Medicare payment differential between outpatient and inpatient status for each group of codes, the 7-year average total Medicare cases, the 7-year average Medicare inpatient percentage for each group of codes, and average damages to the Medicare Program per year.

## 27 HCA Hospitals Each With Damages to the Medicare Program in Excess of $12 Million Per Year

382.    Based on extensive analyses of inpatient admission rates associated with the seven original categories of diagnosis codes discussed above, there are 27 HCA hospitals each with damages to the Medicare Program exceeding $12 million per year from this scheme. Collectively, the inpatient admission scheme at these 27 HCA hospitals account for at least $466 million in annual damages to the Medicare Program. As discussed above, the scheme is broader than these seven categories of diagnosis codes and actual

damages to the Medicare Program are far higher than this $466 million each year.

383.   These 27 hospitals are as follows:

Aventura Hospital and Medical Center
Blake Medical Center
Brandon Regional Hospital
Chippenham Hospital
Clear Lake Regional Medical Center
Fawcett Memorial Hospital
JFK Medical Center
Largo Medical Center
Lawnwood Regional Medical Center & Heart Institute
Los Robles Hospital and Medical Center
Medical City Fort Worth
Memorial Hospital
Methodist Hospital
MountainView Hospital
North Florida Regional Medical Center
Oak Hill Hospital
Ocala Regional Medical Center
Orange Park Medical Center
Redmond Regional Medical Center
Regional Medical Center Bayonet Point
Regional Medical Center of San Jose
Rio Grande Regional Hospital
Riverside Community Hospital
Sunrise Hospital & Medical Center
TriStar Centennial Medical Center
Wesley Medical Center

384.   At these 27 HCA hospitals the average rate of inpatient admissions associated with these common diagnoses codes was 47.7 percent---approximately double the national average of 24 percent.

385. Three HCA hospitals from the East Florida Division are on this list: JFK Medical Center, Aventura Hospital and Medical Center, and Lawnwood Regional Medical Center.

386. Lawnwood leads the 27 hospitals with the highest 7-year inpatient admission percentage of 61.6 percent compared to the national average of 24 percent.

387. Methodist Hospital in San Antonio leads the 27 hospitals in damages to the Medicare Program with average annual damages of $49.2 million.

388. The 7-year average Medicare payment differential or increased Medicare payment from moving these patients to inpatient status was approximately $10,553.00 per admission at these 27 hospitals.

389. 13 of the 27 hospitals are located in Florida where inflated inpatient admission rates applied to high volumes of Medicare patients have caused massive damages to the Medicare Program.

## Defendants' Knowledge of Their Submission of False Claims and False Certifications

390. At all times relevant to this Complaint, Defendants were aware of CMS' guidance regarding when Medicare payment for an inpatient admission was appropriate, and when to bill Medicare for

observation services. Defendants were aware that nursing and medical care and diagnostic testing can be provided and billed as observation services when needed to determine whether a Medicare beneficiary's condition required inpatient admission instead of admitting a beneficiary whenever evaluation of her condition would take longer than an ED visit.

391.    Defendants submitted claims to Medicare on Form UB-92 HCFA-1450 and Form UB-04 CMS-1450. For inpatient services the Defendant Hospitals submitted an inpatient claim form (Type of Bill 11X). For observation services the Defendant Hospitals should have submitted an outpatient claim form (Type of Bill 13X). Each claim form contains an express certification by the provider. For example, claims submitted on Form UB-04 CMS-1450 contain an express certification that, among other things: "the billing information as shown on the face hereof is true, accurate and complete"; and "the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts."

392.    Defendants knew that it was material to Medicare's decision to pay inpatient claims whether inpatient services were reasonable and

necessary for the patient's health as opposed to outpatient or observation services.

393.    Defendants knew that to bill Medicare for observation services they should submit an outpatient claim (Type of Bill 13X) listing the appropriate HCPCS codes that map to an APC for the care that was furnished to the patient instead of billing on an inpatient claim form (Type of Bill 11X).

394.    By submitting inpatient claim forms using ICD-9-CM codes that map to a DRG that are used exclusively for inpatient admissions that they were representing to Medicare that the patient required inpatient admission.

395.    Defendants knew that they submitted inpatient claims to Medicare using ICD-9-CM codes that map to a DRG representing that inpatient admission was necessary and that inpatient services were provided for patients who did not require inpatient admission and who either (a) received only observation services; or (b) who received medically unnecessary inpatient services.

396.    For financial reasons Defendants chose to not order or bill for outpatient or observation services. The certifications on each such claim that the billing information was true, accurate and complete,

and that "the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts" were false because the patient's medical condition did not require inpatient admission and the care actually provided was consistent with outpatient or observation services or treatment.

397. In addition to the interim patient-specific claim payments, hospitals are required to annually submit a Medicare Cost Report. The Medicare Cost Report determines a provider's Medicare reimbursable costs for a fiscal year. *See* 42 U.S.C. § 1395g(a); 42 C.F.R. §413.20. The cost report is the provider's final claim for payment from the Medicare program for the services rendered to all program beneficiaries for a fiscal year. Medicare relies on the Medicare Cost Report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare for the overpayment. *See* 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

398. Each Medicare Cost Report contains an express certification that must be signed by the chief hospital administrator or a responsible designee of the administrator. The Medicare Cost

Report Certification, which is a preface to the cost report's certification, provides the following prominent warning:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST RPEORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES, AND/OR IMPRISONMENT MAY RESULT.

399. This advisory is followed by the actual certification language itself:

> CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER
>
> I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [name of facility, ID number of facility] for the cost reporting period beginning [date] and ending [date] and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations."
>
> CMS Form 2552, Medicare Cost Report.

400.    Each HCA hospital executed and submitted a hospital cost report to Medicare annually that contained the quoted certification. The certifications were false in that the cost reports included inpatient days associated with paid inpatient claims that should have been billed as outpatient observation services or outpatient treatment, in violation of the Medicare law, regulations and Manual guidance regarding billing for inpatient services.

401.    At all times relevant to this Complaint, Defendants received communications and guidance from MACs and other Medicare contractors regarding appropriate billing for outpatient, observation, and inpatient services. At all times relevant to this Complaint, Defendants understood and disregarded Medicare laws, regulations and program instructions regarding the use of outpatient or observation services and the medical necessity of inpatient services.

402.    Defendants knew that the claims and certifications that they submitted, or caused to be submitted, to Medicare were false, or else deliberately ignored, and/or were recklessly indifferent to, the truth or falsity of those certifications and claims.

**Relator's Extensive Analyses of Diagnoses Codes Submitted by Hospitals to Medicare Do Not Constitute a Public Disclosure**

403.    The False Claims Act, 31 U.S.C. § 3730(e)(4), as amended in

March of 2010, provides as follows,

> (4)(A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (iii) from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
> (B) For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(A), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

404.    As an initial requirement, the potential public disclosure at

issue must occur through one of the specific sources enumerated in

the statute.

405.    There are three groups of specific sources enumerated in 31

U.S.C. § 3730(e)(4)(A): (1) "a criminal, civil or administrative

hearing,"(statutory language prior to March 23, 2010) or "a Federal

criminal, civil, or administrative hearing in which the Government

or its agent is a party," (current statutory language); (2) "the news

134

media," and (3) "a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation" (statutory language prior to March 23, 2010) or "a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation" (current statutory language).

406. Prior to Relator filing this action, the allegations at issue as to any Defendant were never publicly disclosed in any of the specific sources enumerated in the statute.

407. The diagnoses codes submitted by HCA hospitals to CMS do not fall within any of the three groups of specific sources enumerated in 31 U.S.C. § 3730(e)(4)(A).

408. First, the diagnoses codes submitted by hospitals to CMS do not represent "a criminal, civil or administrative hearing" or "a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party." 31 U.S.C. § 3730 (e)(4)(A)(i).

409. Second, the diagnoses codes submitted by hospitals to CMS do not represent "the news media." 31 U.S.C. § 3730 (e)(4)(A)(ii).

410. Third, diagnoses codes submitted by hospitals to CMS are not "congressional," "administrative," "Government Accountability Office" or "other Federal" reports, hearings, audits or

investigations. In exposing the false claims at issue, Relator did not use any report authored by the government.

411.    Diagnoses codes submitted by hospitals to CMS do not constitute any of the specific sources enumerated in the False Claims Act---prerequisites to the public disclosure defense. The inquiry ends there without further need to examine whether the additional requirements of the "public disclosure" defense are satisfied.

412.    Further, Relator has not issued any request to the government under the Freedom of Information Act. In preparing this case, Relator has not received, used, or relied on any government response to any request under the Freedom of Information Act.

## Over Two Billion Numeric Codes in a Vast Database Did Not Alert the Government to the False Claims at Issue

413.    Federal Circuit Courts, District Courts, and the United States Department of Justice have recognized that the function of "public disclosure" is to "alert" the government with "a clear and substantial indication of foul play" so as to "set the government squarely on the trail of the alleged fraud."

414.    The public disclosure bar does not apply when the government must comb through the myriad of transactions performed by the various industry defendants in search of false claims. Rather, as recognized by federal courts and the Department of Justice, a public disclosure must "set forth easily identifiable defendants engaged in clear methods of fraudulent activity."

415.    Each fiscal year the Medicare claims file contains numeric codes submitted by Medicare providers with respect to approximately 12 million inpatient admissions for that year. The full annual Medicare claims data file typically has 14 million to 16 million lines of numeric codes submitted by Medicare providers for inpatient admissions. With up to 6 diagnoses codes and 9 procedure codes for each admission,[6] there are up to approximately 180 million numeric codes within Medicare claims data each year signifying specific diagnoses and procedures for Medicare patients. Buried within this massive database of millions of numeric codes are the diagnoses codes related to this case.

---

[6]  In 2010 Medicare expanded the 6 diagnoses codes to 25 codes and expanded the 9 procedure codes to 25 codes.

416.   For example, over the time period at issue in this case, there were over 2 billion numeric codes submitted by Medicare providers to CMS concerning inpatient admissions. None of the 2 billion codes contains any allegation of fraud or false claims. The numeric codes are innocuous numbers.

417.   The hundreds of millions of numeric codes submitted by Medicare providers each year did not sufficiently alert the government to false claims submitted by HCA hospitals.   To conclude otherwise would mean that the federal government is "alerted" to every false claim evidenced by any numeric code within a vast database of over 300 million codes submitted by Medicare providers each year to CMS.

418.   Unless there has been a public disclosure of allegations of false claims or fraudulent transactions through one of the specific channels enumerated in the False Claims Act, then the source and extent of Relator's knowledge are irrelevant and there is no need to consider whether Relator satisfies the "original source" exception to the public disclosure defense.[7]

_____

[7] The facts would satisfy the original source exception if it applied.

## Count I---Presenting False Claims in Violation of 31 U.S.C. § 3729(a)(1)(A)

419.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

420.    In pertinent part, the Federal False Claims Act establishes liability for "any person who…knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." *See* 31 U.S.C. § 3729(a)(1)(A).

421.    Defendants knowingly or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented false claims "for payment or approval" to the United States in violation of 31 U.S.C. § 3729(a)(1)(A).

422.    This is a claim for treble damages and penalties under the Federal False Claims Act, 31 U.S.C. § 3729, *et seq*., as amended.

423.    Through the acts described above, Defendants knowingly or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented, false claims to officers, employees or agents of the United States Government within the meaning of 31 U.S.C. § 3729(a)(1)(A).

424.    The United States was unaware of the falsity of the records,

statements and claims made or caused to be made by Defendants. In reliance on the accuracy of the claims, information, records, and certifications submitted by Defendants, the United States paid and continues to pay claims that would not be paid if Defendants' illegal conduct was known.

425.    As a result of Defendants' acts, the United States has sustained damages, and continues to sustain damages, in a substantial amount to be determined at trial.

426.    Additionally, the United States is entitled to civil penalties for each false claim made or caused to be made by Defendants arising from their illegal conduct as described above.

427.    Defendants knowingly (as "knowingly" is defined by 31 U.S.C. 3729(b)(1)) presented or caused to be presented false or fraudulent claims for payment or approval to the United States. Specifically, Defendants knowingly submitted false claims to Medicare on Forms UB-92 HCFA-1450, UB-04 CMS-1450, Type of Bill 11X signifying an inpatient claim, and CMS-2552 for payment of medically unnecessary inpatient admissions that should have been classified and billed as outpatient/observation cases.

428.     By virtue of Defendants' false or fraudulent claims, the United States incurred damages and therefore is entitled to multiple damages under the False Claims Act, plus a civil penalty for each violation of the Act.

## Count II---False Claims Act: Making or Using False Records or Statements, 31 § U.S.C. 3729(a)(1)(B)

429.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

430.     In pertinent part, the Federal False Claims Act establishes liability for "any person who…knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *See* 31 U.S.C. § 3729(a)(1)(B).

431.     This is a claim for treble damages and penalties under the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.,* as amended.

432.     Through the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements. Through the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to get false claims paid or approved,

within the meaning of 31 U.S.C. § 3729(a)(1)(B).

433.    Defendants knowingly made, used, or caused to be made or used false records or statements with the intent to get or cause these false claims to be paid by the United States.

434.    The United States was unaware of the falsity of the records, statements, certifications, and claims made or caused to be made by Defendants.  The United States paid and continues to pay claims that would not be paid if Defendants' illegal conduct was known.

435.    By virtue of the false records or false claims made by Defendants, the United States sustained damages and therefore is entitled to treble damages under the Federal False Claims Act in an amount to be determined at trial.

436.     Additionally, the United States is entitled to civil penalties for each false claim made and caused to be made by Defendants arising from their illegal conduct as described above.

437.    Defendants knowingly (as "knowingly" is defined by 31 U.S.C. 3729(b)(1)) made, used, or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the United States. Specifically, Defendants knowingly made false statements to Medicare on Forms CMS-855A, CMS-

8551, UB-92 HCFA-1450, UB-04 CMS-1450, Type of Bill 11X signifying an inpatient claim, and CMS-2552, regarding, inter alia, Defendants' compliance with Medicare requirements and the accuracy of Defendants' billing information and cost data.

438. By virtue of the Defendants' false records and statements, the United States incurred damages.

## Count III-Conspiring to Submit False Claims in Violation of 31 U.S.C. § 3729(a)(1)(C) Against All Defendants

439. Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

440. In pertinent part, the Federal False Claims Act establishes liability for "any person who….conspires to commit a violation of subparagraph (A),(B),(D),(E),(F), or (G)." 31 U.S.C. § 3729(a)(1)(C).

441. This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. § 3729, *et seq.,* as amended.

442. Through the acts described above, Defendants acting in concert with each other and other contractors, agents, partners, and/or representatives, conspired to knowingly present or cause to be

143

presented, false claims to the United States and knowingly made, used, or caused to be made or used, false records and statements, and omitting material facts, to get false claims paid or approved.

443.    As a result, the United States was unaware of the false claims submitted and caused by Defendants and the United States paid and continues to pay claims that would not be paid if the Defendants' illegal conduct was known to the United States.

444.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

445.    By virtue of Defendants' conspiracy to defraud the United States, the United States sustained damages and is entitled to treble damages under the Federal False Claims Act, to be determined at trial, plus civil penalties for each violation.

## Count IV---Submission of Express and Implied False Certifications in Violation of 31 U.S.C. § 3729(a)(1)(B) Against All Defendants

446.    Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

447.    In pertinent part, the False Claims Act establishes liability for "any person who…knowingly makes, uses, or causes to be made or

used, a false record or statement material to a false or fraudulent claim." *See* 31 U.S.C. § 3729(a)(1)(B). .

448.   In reliance on the Defendants' express and implied certifications, the United States made payments to Defendants under Federal Healthcare Programs. If the United States had known that Defendants' certifications were false, their payments would not have been made to Defendants for each of the years in question.

449.   By virtue of the false records, false statements, and false certifications made by Defendants, the United States sustained damages and is entitled to treble damages under the False Claims Acts, to be determined at trial, plus a civil penalty for each violation.

### Count V---Knowingly Causing and Retaining Overpayments in Violation of 31 U.S.C. § 3729(a)(1)(G) Against All Defendants

450.   Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

451.   The Federal False Claims Act also establishes liability for any person who "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." *See* 31 U.S.C. § 3729(a)(1)(G). The False Claims

Act defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." *See* 31 U.S.C. § 3729(b)(3).

452.    Defendants have knowingly caused and retained overpayments from Federal Healthcare Programs arising from Defendants' violations of federal laws discussed above.

453.    By virtue of Defendants causing and retaining overpayments from the Medicare Program, the Medicaid Program, and other Federal Healthcare Programs, the United States sustained damages and is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## Count VI--- False Record to Avoid an Obligation to Refund Against All Defendants

454.    Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

455.    The False Claims Act also establishes liability for any person who "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." *See* 31

U.S.C. § 3729(a)(1)(G).

456.    Defendants knowingly made and used, or caused to be made or used, false records or false statements, i.e., the false certifications made or caused to be made by Defendants in submitting the cost reports, to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

457.    By virtue of the false records or false statements made by the Defendants, the United States sustained damages and therefore is entitled to treble damages, to be determined at trial, plus civil penalties for each violation.

## **Prayers for Relief**

**458.**    On behalf of the United States, Relator requests and prays that judgment be entered against Defendants in the amount of the United States' damages, trebled as required by law, such civil penalties as are required by law, for a qui tam relator's share as specified by 31 U.S.C. §3730(d), for attorney's fees, costs and expenses as provided by 31 U.S.C. §3730(d), and for all such further legal and equitable relief as may be just and proper.

**Jury trial is hereby demanded.**

This  of September, 2017.

_____

Jerry E. Martin
Seth Hyatt
Barrett, Johnston Martin & Garrison, LLC
414 Union Street; Suite 900
Nashville, TN 37219
(615) 244-2202

**Lead Counsel:**
Bryan A. Vroon, Esq.
(Motion for *Pro Hac* Admission to be submitted)
Georgia Bar No. 729086
Law Offices of Bryan A. Vroon, LLC
1766 West Paces Ferry Road
Atlanta Georgia 30327
(404) 441-9806
bryanvroon@gmail.com

Edward D. Robertson, Jr.
(Motion for *Pro Hac* Admission to be submitted)
Bartimus, Frickleton & Robertston
715 Swifts Highway
Jefferson City, MO. 65109
573-659-4454
chiprob@earthlink.net

## Certificate of Service

This is to certify that I have this day served a copy of the Relator's Complaint by depositing a true and correct copy of same by Certified Mail in the United States Mail, postage prepaid, addressed as follows:

The Honorable Attorney General Jeff Sessions
Attorney General of the United States
Attention: Seal Clerk
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530-0001

The Honorable Mark H. Wildasin
United States Attorney for the Middle District of Tennessee
Attention: Seal Clerk
110 9th Avenue South, Suite A-961
Nashville, Tennessee 37203

This 19th day of September, 2017.

Jerry Martin